**Ronald Jeffrey HARRIS, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 45S00–9210–CR–832.

Supreme Court of Indiana.

Aug. 25, 1993.

Marce Gonzalez, Jr., Lake Superior Court, Appellate Div., Crown Point, for appellant.

Pamela Carter, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Following a jury trial, appellant Ronald Jeffrey Harris was convicted of Count I, murder, Ind.Code § 35–42–1–1(1); Count II, felony murder, I.C. § 35–42–1–1(2); and Count III, attempted murder, a Class A felony, I.C. § 35–42–1–1 and I.C. § 35–41–5–1. The trial court vacated the conviction for murder and sentenced him to consecutive terms of sixty (60) years imprisonment for the felony-murder conviction and thirty (30) years imprisonment for the attempted murder conviction respectively.

On direct appeal, appellant Harris raises the issue of whether evidence of a witness's pretrial and in-court identification was properly admitted.

## I.

The facts most favorable to the verdict show that Rhonda Hammersley and Carrie Jillson, co-workers at the Petro Mart gas station in Cedar Lake, Indiana, closed the station October 30, 1990, at approximately 10:15 p.m. After completing her closing routine, Jillson moved her car around to the front of the station. Hammersley locked the door to the building and then joined Jillson in front of the station where they talked while waiting for Hammersley's husband to pick her up. Jillson remained seated in the driver's seat of her car, while Hammersley spoke to her through the driver side window. Large canopy lights on the north side of the gas station and other outdoor lights surrounding the gas station illuminated the area.

Jillson testified that while they waited for Mr. Hammersley, she saw three or four automobiles drive by the station. Jillson observed one of these vehicles, which she believed was a white Renault Alliance, run a nearby stop sign and turn onto a side street near the station. Moments later, Jillson saw a man run from behind the back of her car toward Hammersley. According to Jillson's testimony, he stopped three or four feet from Jillson, raised a shotgun up to Hammersley's head, and then fired a fatal shot.

After the gunman killed Hammersley, he turned toward Jillson, looked at her, then aimed his shotgun at her. Jillson, after seeing the man face her and aim the shotgun in her direction, fell to her right, onto the front seat of her vehicle. Almost simultaneously, the shotgun discharged, missing Jillson and hitting the inside panel of the passenger door. While remaining down on the front seat, Jillson felt what she assumed to be the barrel of the shotgun pushing against the back of her head. Then she heard an individual state "all right, that's enough. Let's go." Seconds later, Jillson raised up from the seat. Seeing no one around, she immediately drove to a nearby liquor store and sought police assistance.

Jillson testified that she initially described the gunman to the police as wearing tennis shoes, jeans and a long coat, and having dark shoulder-length hair and dark eyes. Record at 215. Two weeks later, Jillson worked with the police on a composite picture of the gunman. After she finished the composite picture, Jillson expressed doubts about the picture's accuracy. The composite picture included Jillson's description of the gunman, printed along the bottom of it, which read as follows: male, Caucasian, 5'10", early to mid twenties, slender build, dark eyes, prominent brow line, light complexion, no facial hair, dark brown collar length hair. Record at 223.

In January, 1991, the local newspaper published an article on recent shotgun murders which included a photograph of an African–American man. In response to a call from a police detective, Jillson told the detective that the man in the newspaper was "definitely not" the gunman who killed Hammersley. In addition, Jillson stated that she believed that there were problems with the composite picture, including the fact that she now thought the gunman was probably hispanic, not caucasian.

The newspaper published a subsequent article in February, 1991, which included a photograph of Appellant. Jillson testified that she looked at appellant's photograph,

but she did not read the accompanying article.

Two weeks later, the Cedar Lake Police Department asked Jillson to view a lineup at the county jail. The lineup, conducted in the presence of appellant Harris' attorney, consisted of seven African–American and two Hispanic men. Each subject was of similar age, height, skin color, hair length and wore identical clothing. Jillson identified appellant Harris from among the nine subjects in the lineup as Hammersley's killer.

In April, 1992, Jillson identified appellant Harris in open court as Hammersley's killer. Jillson testified at trial that she was "positive" appellant fired the shotgun into Hammersley's head. Record at 274.

In his appeal, appellant Harris claims that the trial court erred when it admitted evidence of the pretrial lineup and Jillson's in-court identification. He argues that the pretrial lineup was impermissively suggestive in violation of his due process rights. Therefore, Jillson's subsequent in-court identification was tainted and should also have been suppressed.

■ At trial there was no objection to the introduction of Jillson's identification evidence. Consequently, the admissibility of the evidence of pretrial lineup and in-court identification was not drawn in question and the issue was not preserved for appeal. *Madden v. State* (1990), Ind., 549 N.E.2d 1030, 1032; *Lee v. State* (1988), Ind., 519 N.E.2d 146, 147.

■ Nonetheless, appellant claims that the alleged due process violations rise to the level of fundamental error and, therefore, should be reviewed on direct appeal. "In order to rise to the level of fundamental error, the error must constitute a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and

apparent." *James v. State* (1993), Ind., 613 N.E.2d 15, 25. We disagree with appellant's conclusion that the facts presented give rise to a valid claim of fundamental error.

■ Where a trial court has admitted evidence of pretrial and an in-court identification of the accused by the same witness, the reviewing court must determine whether, under the totality of the circumstances, the pretrial confrontation was so impermissibly suggestive and conducive to irreparable mistaken identification that the accused was denied due process of law under the Fourteenth Amendment. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Brooks v. State* (1990), Ind., 560 N.E.2d 49; *Dillard v. State* (1971), 257 Ind. 282, 274 N.E.2d 387.[1] The reviewing court must first determine whether law enforcement officials conducted the out-of-court procedure in "such a fashion as to lead the witness to make a mistaken identification." *Brooks,* 560 N.E.2d at 55. If, under the totality of the circumstances, the reviewing court finds the out-of-court procedures were not impermissibly and unnecessarily suggestive, both the evidence of the pretrial lineup and the in-court identification are considered to have been properly admitted by the trial court, and there is no need to proceed further. *Id.*

## II.

■ First, appellant contends that, despite Jillson's initial description of the gunman as a Caucasian, the government arranged a lineup of only non-caucasian men. According to appellant, this resulted in an unduly suggestive lineup.

■ A claim of suggestiveness based on differing skin color will succeed only where there is a marked difference in the color of the defendant as compared to the others

---

1. Here we discuss the admissibility of the evidence of pretrial identification based solely upon the constitutional issue raised by appellant. We note, however, that such evidence must also meet the test of relevancy in order to be admissible. If the witness' in-court identification testimony has not been impeached, there

seems to be no sufficient reason for the introduction of corroborating evidence, such as evidence of a pretrial lineup. In such cases, admitting evidence of prior consistent identification constitutes reversible error. *Thompson v. State* (1944), 223 Ind. 39, 58 N.E.2d 112, 113.

within the lineup which would give rise to a very substantial likelihood of irreparable misidentification. *Caywood v. State* (1974), 160 Ind.App. 346, 311 N.E.2d 845. Here, the pretrial lineup included seven African–Americans and two Hispanics. The record shows that the participants, generally, had similar physical attributes, including skin color. We find no marked difference of skin color between appellant and the other participants which would likely lead Jillson to misidentification.

■ While Jillson initially described the gunman as caucasian, she later told the police that she felt her initial description was not exactly right and that she believed the gunman was a Hispanic. Inconsistencies in identification testimony affect the credibility of the witness, not the admissibility of the identification. *Parsley v. State* (1990), Ind., 557 N.E.2d 1331, 1334. We conclude here that the government's selection of only non-caucasian participants for the pretrial lineup, was not unduly suggestive.

■ Second, appellant argues that Jillson's viewing of his photograph, published in the local newspaper accompanying an article discussing recent shotgun murders, prior to the pretrial lineup, tainted her identification testimony. However, in order to present a valid constitutional argument that a pretrial identification was impermissibly suggestive, one must first show that the law enforcement personnel or the prosecution were responsible for the circumstances giving rise to the claim. *Robertson v. State* (1981), Ind., 429 N.E.2d 258, 260. There is no showing here that law enforcement personnel or the prosecutor had any discussions with Jillson concerning the published photograph prior to the lineup, nor is there evidence of any other actions which would render law enforcement personnel or the prosecutor responsible for the circumstances surrounding the published photograph.

■ Newspapers freely print those articles that they choose for publication. Apparently, the local newspaper acted on its own initiative when it published the stories about the shotgun murders. The viewing by a witness of a newspaper article containing a photograph of the accused and identifying him as a suspect does not constitute an impermissibly suggestive identification. *Norris v. State* (1976), 265 Ind. 508, 356 N.E.2d 204, 206. Any suggestion implanted in the witness' mind by seeing a suspect's photograph in the newspaper should go to weight, and not the admissibility of the identification evidence. *Id.; See also Broadus v. State* (1986), Ind., 487 N.E.2d 1298; and *Gaddis v. State* (1977), 267 Ind. 100, 368 N.E.2d 244. Therefore, the argument that the lineup was impermissively suggestive cannot be supported by any impressions created when Jillson viewed the published photograph of appellant.

## CONCLUSION

Jillson testified that she clearly observed the gunman the evening of Hammersley's murder. The two women were alert at the time to activity in the vicinity of the business, as they were anticipating the arrival of Hammersley's husband. The crime took place in a brightly illuminated area within a few feet of Jillson. The trial court could reasonably determine that Jillson independently identified appellant Harris as the gunman at the pretrial lineup, without the aid of improper procedures.

Under the totality of the circumstances, we conclude that the pretrial lineup was not impermissibly suggestive and the trial court properly admitted this evidence. Because we find that the pretrial procedure was not impermissibly suggestive, there is no need to evaluate whether an independent basis existed for Jillson's in-court identification, and it, too, was properly admitted by the trial court. *Brooks*, 560 N.E.2d at 55; *Norris*, 356 N.E.2d at 206.

The convictions and sentence are affirmed.

SHEPARD, C.J., and GIVAN, DICKSON and KRAHULIK, JJ., concur.