**John J. FARRELL, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 79S02–9310–CR–1147.**

Supreme Court of Indiana.

Oct. 22, 1993.

---

Cynthia L. Garwood, Cooke Laszynski and Moore, Lafayette, for appellant.

Pamela Carter, Indiana Atty. Gen., Preston W. Black, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

ON PETITION TO TRANSFER

KRAHULIK, Justice.

John Farrell (Defendant–Appellant below) was sentenced to a term of forty-eight years following his conviction, by jury, of kidnapping. *Ind.Code Ann.* § 35–42–3–2 (West 1986).[1] The conviction and sentence were affirmed in his original appeal. *Farrell v. State* (1993), Ind.App., 612 N.E.2d 124.

In his petition to transfer, Farrell raises the following issues:

(1) Whether the trial court erred in requiring the jury to continue deliberations;

---

1. Farrell was originally charged with and convicted on six counts: armed robbery, *Ind.Code Ann.* § 35–42–5–1 (West 1986); kidnapping, *Ind. Code Ann.* § 35–42–3–2(a) and (b) (West 1986); confinement, *Ind.Code Ann.* § 35–42–3–3(1) and (2); theft, *Ind.Code Ann.* § 35–43–4–2(a) (West 1986). Merger resulted in his being sentenced only on the more serious kidnapping conviction.

(2) Whether the victim's identification of Farrell was properly admitted;

(3) Whether testimony of an expert on eyewitness identification procedures was properly excluded;

(4) Whether defendant received ineffective assistance of counsel by counsel's failure to move for a hung jury; and

(5) Whether the sentence was manifestly unreasonable.

### Facts

The facts most favorable to the judgment reveal that shortly after 2:00 a.m. on August 18, 1990, in Lafayette, Indiana, Gina Handley stopped to use a pay telephone. She parked her automobile a few steps away from the telephone booth, with the engine running, the driver-side door open, and the headlights on. Immediately after she re-entered the automobile, a man, whom she identified as Farrell, approached her from behind and ordered, "Scoot over, I've got a gun." Handley observed the man standing by the car pointing a gun at her. She moved into the passenger's seat. Farrell entered the automobile and ordered Handley to place her hands behind her neck and keep her head down. Again, Handley obeyed. Farrell began driving through the city. Despite pleas to be let free, Farrell repeatedly threatened Handley and shoved her head down. After fifteen or twenty minutes, Handley was able to jump out of the automobile.

Handley informed police about the attack. The following day, Handley identified Farrell in a photo array. She also identified him at trial as her attacker.

### Jury Deliberations

Farrell argues that the trial court violated his right to a fair trial by requiring the jury to continue their deliberations notwithstanding signs of the jurors' exhaustion. Because we agree that the jury should have been able to rest before further deliberations, we grant Farrell a new trial.

**2.** The questions were: (1) Can we use a presumption of innocence as evidence? (2) Is presumed innocence a defense? (3) Can we have a consensus on some counts and be hung on other

Trial proceeded on June 11, 12 and 13. The jury began its deliberations at about 8:15 p.m. on the 13th. Some time on the morning of the 14th, the jury foreman presented the court with four questions.[2] The foreman reported to the trial court that, although the jury had not yet reached a verdict, he thought one could be reached with additional time. Breakfast was ordered, the instructions were reread, and the jury reviewed exhibits before returning to deliberations. Although defense counsel expressed concern about whether each juror believed that an agreement on all counts could be reached, no objection was made at that time. The court responded:

At this point in time it seems to me it's fairly discretionary with the Court as long as the Foreperson feels that there's a chance of working it out, we've spent—we've been at this for twenty-four straight hours and maybe we ought to let the process work, it's gonna—if we get a hung jury we're gonna have—the defendant's gonna have additional cost and expense and the agony of going through possibly a second trial.

At around noon on the 14th, the jury returned to the courtroom where the following exchange occurred between the court and the jury foreman:

THE COURT: Have you reached a verdict on each of the six counts?

FOREPERSON: No, Your Honor.

THE COURT: Okay, are you at a point where you've reached agreement on any of the counts?

FOREPERSON: Yes, Your Honor.

THE COURT: Okay, and you still have some left that—you feel that any additional time—with additional time that you could reach a unanimous agreement as to all counts?

FOREPERSON: I think that's quite possible.

counts? and (4) In regards to confining, isn't that already covered under counts four and five?

THE COURT: Okay, you've been working awfully hard, and do you want something to—you want us to have dinner brought in?

FOREPERSON: (No audible answer)

THE COURT: Or do you just want a littie bit more time to iron things out—what—what's—as the Foreperson what's your feeling on it?

FOREPERSON: Your Honor, I think if we would need to have lunch brought in.

THE COURT: Okay.

FOREPERSON: Everybody's tired, naturally.

THE COURT: Yes.

FOREPERSON: We're hungry, and that probably might help us out.

THE COURT: And you feel that with—if we bring dinner in or lunch in that you can continue to make progress and be able to make progress toward agreement on each of the counts, is that what I hear you telling me?

FOREPERSON: Yes. Your Honor.

THE COURT: Okay, we'll have some dinner brought in for you. I think at this point I'm going to bring in another bailiff to help us out, I'm gonna send one bailiff home.

UNKNOWN: Not fair.

Lunch was ordered, and the jury returned to deliberations. The following exchange then occurred between the court and counsel:

THE COURT: Okay, I have just sent the jury down to the jury room, I've just directed one of the bailiffs to secure food for the jurors. The Foreperson of the jury has advised the Court in open court that he feels that with some additional time that he feels that the jury can reach unanimity on the remaining counts. Do you have an objection for the record, Mr. Nemeth?

MR. NEMETH [DEFENSE COUNSEL]: Yes, Your Honor, two fold objection; one, for the Court, the Foreman was indicating that he thought there could be an agreement and I saw at least two of the jurors shake their heads at that particular time indicating that there probably couldn't be an agreement. In addition, my second one is that these jurors have worked very hard most—I think they went—began deliberation—and I'm—been up since that time also but I think they began deliberations at 8:15 last night, worked through the night, we know that, we brought them up this morning and asked them if they wanted more time and they at that time indicated that that would be appropriate, the total amount of time I think is now 16 hours, I would request that they be sequestered and given some rest so that they could sit down and give—their thought processes would be back in shape, I think it's gonna be real hard for them at this point for them to come up with a decision.

THE COURT: What would you suggest, Mr. Nemeth, for the record where you'd like the Court to send these jurors to have them sequestered.

MR. NEMETH: Your honor, my suggestion would be some motel I guess would be my only—

THE COURT: Some motel?

MR. NEMETH: That's the only thing that I know.

THE COURT: Okay.

MR. DWYER [THE STATE]: Yes, Your Honor, for the record, the State would join in the defendant's request that the jury would be sequestered, the foreman has indicated his belie[f] that given further time the jurors could reach unanimity. I personally observed a juror crying in the back row a few minutes ago, and I would—

THE COURT: Let me ask you—

MR. DWYER: On behalf of the State request that they—

THE COURT: Let me ask you this question, I don't have any problem sequestering this jury if that's what you two want to do. Do you see any problem or harm if we feed these jurors, bring some food in and in the next hour or two we feed them, bring the food in to

them and then if in the next couple hours we don't reach an agreement then the Court will make arrangements to sequester the jury is that what you—would something like that be a possibility?

MR. NEMETH: Your Honor, I have no problem I guess with feeding the jury and allowing them that, but I guess my objection was—

THE COURT: Do you join in that suggestion?

MR. DWYER: I think that's a reasonable suggestion Your Honor, yes.

THE COURT: I'll take that under advisement. Thank you very much.

MR. DWYER: Thank you Your Honor.

Approximately two to three hours later, the jury returned with a verdict, guilty on all counts.

■ Although we reject Farrell's argument that the trial court abused its discretion in refusing to declare a hung jury, we do agree that the trial court erred in expecting the jury to continue deliberations after being without sleep for a period of approximately thirty hours.

■ The trial court correctly noted that the length of time a jury should be permitted to deliberate is within the sound discretion of the trial court. *King v. State* (1988), Ind., 531 N.E.2d 1154, 1161. In *King,* the trial court continued proceedings until 11:10 p.m., despite the defendant's objections. In holding that the trial court did not abuse its discretion, this Court noted:

The trial judge was also a participant in the trial and was in a better situation to assess fatigue and state of mind tha[n] this court. The decision to continue into the night was one of those undoubtedly made after considering all of the negative aspects whether raised by appellant or not. The judge had the unique ability to weigh the pros and cons of an adjournment and his determination will not be disturbed. That is not to say that all decisions of this type will be met with approval. Rather, it means that a clear showing of abuse of discretion cou-

pled with prejudice to the defendant must be shown.

*Id.*

Accompanying the trial court's wide discretion in these matters, however, is its obligation to conduct the trial proceedings "in a manner that facilitates ascertainment of truth, insures fairness, and obtains economy of time and effort commensurate with the rights of both society and the criminal defendant." *Proctor v. State* (1992), Ind., 584 N.E.2d 1089, 1091. Although the court is allowed broad discretion in fulfilling its responsibility to manage the trial and the jury, *Morris v. State* (1977), 266 Ind. 473, 484, 364 N.E.2d 132, 139, *cert. denied* 434 U.S. 972, the court must be careful not to allow considerations of economy to outweigh the process of fairness. *Proctor,* 584 N.E.2d at 1092. Our system of criminal justice demands a logical verdict which is based, not upon the ability of jurors to remain awake and rational for a period of thirty hours, but upon the evidence presented at trial.

That sleep is necessary for rational human activity has been established by various sleep-deprivation studies. *See, e.g.,* Daniel J. Gottlieb et al., *Effects of a Night Float System on Housestaff Neuropsychologic Function,* 8 J.Gen'l.Internal Med. 146 (1993); Una D. McCann et al., *Sleep Deprivation and Impaired Cognition,* 31 Biological Psychiatry 1082 (1992); Harvey Babkoff et al., *The Effects of Sleep Deprivation, Circadian Rhythmicity and Cognitive Performance,* 14 *Sleep* 534 (1991). These studies show that people who are deprived of adequate sleep are less capable of thinking clearly, maintaining long attention spans, controlling anger, and, most importantly in the context of a criminal trial, making appropriate judgments. Even a single night of shortened sleep can produce adverse effects in mental concentration. The importance of sleep is also recognized in various laws. For example, the number of hours motor carriers may operate is regulated. *Ind.Code* § 8–2.1–22–3(a)(4). Impaired mental faculties might result in a confession being inadmissible.

*See Rodgers v. State* (1979), 270 Ind. 372, 375, 385 N.E.2d 1136, 1138. After twenty-four hours without sleep, we question the ability of many people to remain rational and clear-thinking. Moreover, unlike lawyers and judges and parties, jurors do not have the freedom during deliberations to sleep, exercise, eat, or drink at will in an effort to remain alert.

Given the guilty verdict, one may be naturally inclined to view Farrell's motivation for claiming error with suspicion. *See, e.g., Moore v. State* (1991), Ind.App., 569 N.E.2d 695, 702 (defendant's "complaint appears based on the unfavorable result rather than a bona fide concern for the jury's ability to function with mental acuity after a long day"). Thus, where defendants have been unable to show more than late hours and an adverse verdict, courts have been reluctant to reverse a conviction.

Our research reveals no Indiana cases where the trial court was found to have abused its discretion by keeping the jury too long without rest. In the relatively rare case where this is an issue, convictions have been affirmed. *See, e.g., Peck v. State* (1990), Ind., 563 N.E.2d 554, 559 (deliberations began after 9:00 p.m.); *Evans v. State* (1990), Ind., 563 N.E.2d 1251, 1258 (final argument began at 10:00 p.m.); *Morris v. State*, 266 Ind. at 484, 364 N.E.2d at 139, (jury request for sleep or coffee at 3:30 a.m. denied); *Moore v. State* (1991), Ind.App., 569 N.E.2d 695, 702 (deliberations continued until 2:05 a.m.). In none of these cases, however, was the jury required to be "on duty" throughout the night and halfway into the next day without sleep.

█ By this decision, we do not intend to establish any mandatory curfew for the jury. We continue to agree with the principles set forth in *King*, 531 N.E.2d at 1161, that the trial court is in the best position to determine when a jury should be permitted to retire for the evening based upon the circumstances in each particular case. We are also aware that because this jury was deliberating and its members could not be sent home for the night, accommodating the jury's need for sleep would have involved additional expense to the county.[3]

█ Nonetheless, here, even the prosecutor joined in the defense request that the jurors be allowed to rest. Further, although the foreman indicated that with additional time he believed the jury could reach a unanimous verdict, other jurors made it clear that they needed rest before proceeding. The trial court should have accommodated them. Because a verdict reached after a thirty-hour period without sleep must be suspect, Farrell is entitled to a new trial.

We have dispensed with trial by ordeal for litigants, and should do so for jurors as well.

### Identification Evidence Properly Admitted

█ Farrell argues that the trial court erred in admitting evidence of a pre-trial and an in-court identification of him by Handley because the pre-trial identification procedure was so unduly suggestive that it tainted the victim's in-court identification. We address this issue because it is likely to arise on retrial.

█ Due process of law requires suppression of testimony concerning an out-of-court identification when the procedure employed was unnecessarily suggestive. *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Dillard v. State* (1971), 257 Ind. 282, 286, 274 N.E.2d 387, 389. The reviewing court must determine whether, under the totality of the circumstances, the identification process was conducted in such a way that it created a substantial likelihood of irreparable misidentification. *Harris v. State* (1993), Ind., 619 N.E.2d 577. Factors to be considered in evaluating the likelihood of a misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree

---

3. *Ind.Code Ann.* § 35–37–2–6 (West 1986) controls jury deliberations in criminal cases. This section has been interpreted as prohibiting the separation of jurors once their deliberations have begun. *Bales v. State* (1981), 275 Ind. 515, 519–20, 418 N.E.2d 215, 218. By contrast, juries in civil cases may be allowed to separate temporarily. *Ind.Code Ann.* § 34–1–21–5 (West 1983).

of attention, (3) the accuracy of the witness's prior description of the criminal, and (4) the level of certainty demonstrated by the witness. *James v. State* (1993), Ind., 613 N.E.2d 15, 27. Thus, if the pre-trial identification procedure was unduly suggestive, then testimony relating to it is inadmissible.

We address first the photographic array. One day after the crime, Handley was shown facial color photographs of three males. She selected Farrell's as the perpetrator. Farrell complains that this procedure was flawed because (1) Handley was told by a detective that it was possible that the suspect might be in the photographic array; (2) the array should have included more than three photographs; and (3) the two other photographs were not similar enough to his own.

Indiana courts have recommended that photo arrays consist of at least five or six individuals. *Porter v. State* (1979), 272 Ind. 267, 269, 397 N.E.2d 269, 271. Depending upon the surrounding circumstances, however, an array of fewer than five does not render the testimony regarding the identification inadmissible per se. *Id.* In the present case, police officers testified that they included only three photographs in the array because they were unable to find more than two other individuals sufficiently resembling the defendant. Each of the three photographs showed a white male having dark eyes, moderate hair length, and no facial hair. The victim herself testified that the photographs depicted individuals having a similar appearance. We do not perceive that the fact that Farrell wore a dark t-shirt or had a hair style slightly different from the others resulted in an impermissibly suggestive array. There is no requirement that law enforcement officers "perform the improbable if not impossible task of finding four or five other people who are virtual twins to the defendant." *Pierce v. State* (1977), 267 Ind. 240, 246, 369 N.E.2d 617, 620. It is sufficient if the defendant "does not stand out so strikingly in his characteristics that he virtually is alone with respect to identifying features." *Id.*

Handley had sufficient opportunity to view the perpetrator at the time of the crime. She testified that it was not difficult for her to see his face and she had the opportunity to view him at close range under good lighting conditions. She provided police with a detailed description of his appearance which was consistent throughout. Upon selecting his photograph from the array, she indicated she was one hundred per cent certain that he was the perpetrator. Under these circumstances, we do not perceive that the photo array was unduly suggestive.

Under the totality of the circumstances, we conclude that the pre-trial lineup was not impermissibly suggestive, and this evidence was properly admitted. Accordingly, we need not address whether an independent basis existed for Handley's in-court identification because it was also properly admitted by the trial court. *Harris*, 619 N.E.2d 577. Contrary to Farrell's assertion, an in-court identification does not become invalid merely because ten months passed between the time of the crime and the in-court identification. *Wolf v. State* (1990), Ind., 562 N.E.2d 414, 416.

### Expert Witness

Farrell argues the trial court erred in refusing to admit testimony from Dr. Steven Penrod that would have tended to cast doubt on the accuracy of the victim's eyewitness identification of Farrell. Although this issue is likely to occur on retrial, we do not decide it here because the newly-adopted Indiana Rules of Evidence which become effective January 1, 1994, will answer this issue. The decision of whether to allow the testimony should be resolved under these new rules.

### Remaining Issues

Because we grant Farrell a new trial, we need not address the remaining issues raised in his petition.

### Conclusion

Accordingly, we grant transfer, vacate the opinion of the Court of Appeals, re-

verse Farrell's convictions, and grant a new trial.

SHEPARD, C.J., and DeBRULER and DICKSON, JJ., concur.

GIVAN, J., dissents with separate opinion.

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in this case which holds that a new trial should be granted because the jury was required to deliberate for over thirty hours without sleep. While I agree with the majority that the trial judge abused his discretion in not sending the jury to a hotel or motel within a reasonable time during the night, I do not think his failure to do so justifies a new trial.

As pointed out by Judge Sullivan in the opinion of the Court of Appeals, each time the jury was questioned the foreman indicated he felt they could reach a decision in just a short time. When the verdict eventually was returned, each of the jurors was polled and each stated that the verdict was their decision. Although the judge's abuse of discretion undoubtedly was hard on the jury, there is no indication that the decision was unfair. The evidence of appellant's guilt is overwhelming. I cannot justify the use of judicial time and the waste of taxpayer's money in a retrial.

I would affirm the trial court.