## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 08 2017, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brent Lavon Thomas, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | August 8, 2017 <br><br> Court of Appeals Case No. <br> 49A04-1612-CR-2763 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Sheila A. Carlisle, Judge <br><br> The Honorable Stanley Kroh, Magistrate <br><br> Trial Court Cause No. <br> 49G03-1511-MR-42385 |

**Altice, Judge.**

## Case Summary

[1] Following a jury trial, Brent Thomas was convicted of murder, a felony, and sentenced to sixty years imprisonment. On appeal, Thomas argues that the trial court abused its discretion in allowing evidence of a witness's out-of-court identification of him as the shooter.

[2] We affirm.

## Facts & Procedural History

[3] John Clemons, known to many as "Uncle Johnny," lived at the corner of 33rd Street and North Butler Avenue in Indianapolis. Clemons had known Ronald Munn for six to seven years and had worked on Munn's cars. Clemons also knew Thomas and his brother, Bryant (a.k.a., "Tubby"), for six to seven years because their grandmother, known to many as "Granny," lived in the cul-de-sac, three houses down from Clemons. *Transcript Vol. 2* at 50.

[4] Around 11:00 a.m. on November 25, 2016, Clemons went outside and saw Munn, who had parked his car in front of Granny's house and was talking to Tubby and Lamar McNary. Munn yelled to Clemons that he needed to retrieve some phone numbers from the phone he had previously given to Clemons. Clemons walked over to Munn and gave him the cell phone. As Clemons returned to his home, Antonio Kinnebrew pulled up in his white Impala.

[5] Clemons and Kinnebrew were standing beside Kinnebrew's car when Munn pulled his car up beside the Impala. At that same time, Thomas and two other

individuals, Tyre Sherman and Dominique,[1] came out of a blue house located in the cul-de-sac.[2] Of the three men, Thomas was the shortest. A verbal confrontation ensued, with "fighting words" being exchanged between Munn and Sherman. *Id*. at 56. Munn then backed up and got out of his car. Clemons and Kinnebrew watched as Sherman took off his white t-shirt and laid it on the ground and Munn removed his jacket. Sherman and Munn then started fighting in the middle of the street—throwing punches and kicking at each other. Munn eventually overpowered Sherman and "beat him up real bad" such that Sherman fell to the ground and could not get up. *Id*. at 60. Dominique, who was recording the fight with his cell phone, said something as he approached Munn, and Munn stopped the assault on Sherman. As Munn started to get up off of Sherman, Thomas, who was seen holding a gun sideways in his hand, fired shots at Munn. Munn looked at Clemons, who was still standing next to the white Impala and said, "Uncle Johnny, I'm hit…. Call 911." *Id*. at 62. Thomas then fired additional shots, hitting Munn again. In total, Munn suffered three gunshot wounds—one to his hip, one to his shoulder, and one to his chest that proved to be fatal.

[6] As Munn stumbled toward his car, Thomas headed back toward the house from which he came and other bystanders ran for cover. Munn managed to get into his car and then drove north toward 34th Street. Kinnebrew got into his car and

---

[1] Neither party provides a last name for Dominique.

[2] Sherman lived in the blue house.

called 911. Shortly thereafter, Clemons also got into Kinnebrew's car and they followed Munn, ultimately locating Munn's car at a gas station at 34th Street and Emerson Avenue. Clemons found Munn curled up beside his car. Believing that Munn was dead, Clemons and Kinnebrew returned to Clemons's home, where they encountered police responding to the 911 call reporting the shooting. Clemons told the police what had happened and identified Thomas as the shooter. Clemons later identified Thomas from a photo array. Kinnebrew likewise told police that "the shorter" of the individuals (i.e., Thomas) was the shooter and later identified Thomas from a photo array. *Transcript Vol. 3* at 14.

[7] Kyle Ellis was a civil engineer employed by a company doing work for the Department of Public Works for the City of Indianapolis. On the day of the shooting, Ellis and his co-worker were driving on 33rd Street, surveying the streets for needed services. Ellis was driving a full-sized pick-up truck and came to a stop at the intersection of 33rd Street and North Butler Avenue. Ellis's path was hindered by Munn's car and the men in the area. Ellis saw Munn exit his vehicle and take off his jacket and Sherman take off his shirt and then watched as the two men engaged in a physical confrontation in the street. Ellis tried to turn the truck around and retreat from the situation, but was blocked from doing so by a fence. Ellis then turned the truck back toward the intersection and saw Munn knock Sherman to the ground. He then heard gunfire and saw a man holding a semi-automatic gun sideways, firing at Munn. Munn collapsed to the ground as Ellis drove away from the intersection. Ellis observed the

shooter run from the intersection. Ellis called 911, but did not remember if he provided his name.

[8] About a week after the shooting, Ellis and his co-worker came across a news article about the shooting that included a photograph of Thomas. Ellis's "first thought" was that the picture "looked like . . . [t]he shooter." *Transcript Vol. 2* at 129. Ellis contacted police and was interviewed on December 3, 2016. About six months after he had spoken with the police, Ellis was shown a photo array, but could not identify Thomas. Over Thomas's objection, Ellis testified at trial about identifying Thomas through the picture contained in the news article. He also testified regarding the physical characteristics of the other individuals he saw in the area of the shooting, and described the shooter as "the shortest" one.[3] *Id*. at 123.

[9] On November 30, 2015, the State charged Thomas with murder. A jury trial commenced on September 29, 2016, but ended in a mistrial when the jury failed to reach a verdict. A second jury trial was held on October 24-25, 2016, at the conclusion of which the jury found Thomas guilty as charged. Thomas was subsequently sentenced to sixty years imprisonment. He now appeals.

## Discussion & Decision

---

[3] Ellis described Sherman as "stocky," Dominique as "fairly tall" and "wearing a white track type suit," and Thomas as "the shorter . . . probably about six inches or more shorter than the tall black male." *Transcript* at 119, 121, 122.

[10]    Thomas argues that the trial court abused its discretion in allowing the State to introduce evidence of Ellis's out-of-court identification of him as the shooter.

[11]    A trial court's decision regarding the admission of evidence is squarely within that court's discretion, and we afford it great deference on appeal. *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). We will not reverse such a decision unless it is clearly contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law. *Id.*

[12]    "The Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action which deprives a person of life, liberty, or property without the 'process' or 'course of law' that is due, that is, a fair proceeding."[4] *Gingerich v. State*, 979 N.E.2d 694, 710 (Ind. Ct. App. 2012), *trans. denied*. The identification of a defendant must comport with the standards of due process. *Lewis v. State*, 898 N.E.2d 429, 432 (Ind. Ct. App. 2008), *trans. denied*. Thus, if an out-of-court identification was obtained by law enforcement in an impermissibly suggestive manner, then the testimony relating to it is inadmissible. *Rasnick v. State*, 2 N.E.3d 17, 23 (Ind. Ct. App. 2013), *trans. denied*. If, "under the totality of the circumstances, the identification was reliable even though the procedure was suggestive," such identification is admissible. *Hubbell v. State*, 754 N.E.2d 884, 892 (Ind. 2001).

---

[4] Thomas does not present a separate and independent argument under the Indiana Constitution. We therefore confine our review to consideration of federal due process protections.

[13] Underlying the due process requirement is state action via the use of suggestive identification procedures by law-enforcement officials. "[I]n order to present a valid constitutional argument that a pretrial identification was impermissibly suggestive [because the witness had viewed defendant's photograph in a news article prior to a pretrial lineup], one must first show that the law enforcement personnel or the prosecution were responsible for the circumstances giving rise to the claim." *Harris v. State*, 619 N.E.2d 577, 581 (Ind. 1993). In other words, when an identification is attended only by private action such as publication of a photograph or other material by print or electronic media, the required element of state action is missing and due process concerns do not limit admission of the identifying testimony. *Id.*

[14] Here, Ellis's pre-trial identification resulted from his viewing of Thomas's picture in a news article. Thomas even acknowledges that there was no state action as the police were not involved in Ellis' pretrial identification. Due process protections are therefore not implicated. *See id.*

[15] Notwithstanding the lack of state action, Thomas argues that the circumstances of Ellis's pre-trial identification—that he identified Thomas upon viewing Thomas's picture in a news article—were such that his pre-trial identification was unreliable and therefore inadmissible. Our Supreme Court has rejected this very argument. In *Broadus v. State*, 487 N.E.2d 1298, 1300-01 (Ind. 1986), witnesses to a robbery provided descriptions of the suspects immediately after the crime. After the witnesses viewed the pictures of the suspects in the newspaper, they changed their descriptions to conform more closely with the

characteristics of the suspects. The defendants challenged the admissibility of the in-court identification of them by the victims as being tainted by suggestive identification procedures. The Court held that "any suggestion implanted in the witness' mind by seeing a suspect's photograph in the newspaper should go to the weight, and not the admissibility, of the in-court identification." *See also Norris v. State*, 265 Ind. 508, 512, 356 N.E.2d 204, 206 (1976) (holding the viewing by a witness of a newspaper article containing a photograph of the accused and identifying him as the suspect does not constitute an impermissibly suggestive identification procedure). Here, Thomas did not make an in-court identification of Thomas. Further, Thomas's arguments as to why Ellis's pre-trial identification of him is unreliable are matters that go to the weight to be afforded his testimony, not its admissibility. The trial court did not abuse its discretion in allowing the State to present Ellis's identification testimony.

[16] Even if the admission of such evidence was error, any error would be harmless.[5] An error in the admission of evidence is harmless "when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Granger v. State*, 946 N.E.2d 1209, 1213 (Ind. Ct. App. 2011) (quoting *Lafayette v. State*, 917 N.E.2d 660, 666 (Ind. 2009)). In other words, we will reverse "only if the record as a whole discloses

---

[5] For the reasons stated herein, we need not delve into Thomas's arguments that Ellis's testimony was not relevant and unduly prejudicial. *See* Ind. Evidence Rules 401 and 403.

that the erroneously admitted evidence was likely to have had a prejudicial impact upon the mind of the average juror, thereby contributing to the verdict." *Id*. (quoting *Wales v. State*, 768 N.E.2d 513, 521 (Ind. Ct. App. 2002), *trans. denied*). Further, any error in admitting evidence will be found harmless where evidence is merely cumulative. *Kilpatrick v. State*, 746 N.E.2d 52, 57 (Ind. 2001).

[17] Here, we first note that the State did not elicit from Ellis an in-court identification of Thomas as the shooter. Further, Ellis unequivocally testified before and during trial that his recognition of Thomas's photograph as a photograph of the man he saw shoot Munn was occasioned by the publication of the photograph by a news outlet. At trial, Ellis testified only as to what he had personally witnessed on the day of the incident and his conclusion that the photograph published by the news source was a photograph of the person he had seen shooting at Munn that day. Thomas thoroughly cross-examined Ellis, challenging the reliability of his conclusion that Thomas was the shooter. The jury was also made aware that when Ellis was presented with a photo array by police approximately six months after the shooting, Ellis was unable to identify Thomas.

[18] Moreover, we note that Ellis's testimony was not the only evidence identifying Thomas as the shooter. Clemons, who had known Thomas for over six years, clearly and unequivocally testified that he "saw [Thomas] do the shooting" and also identified him from a photo array. *Transcript Vol. 2* at 67. Kinnebrew also testified and confirmed that he identified Thomas as the shooter from a photo

array.  Ellis's identification testimony was merely cumulative of other properly admitted evidence to the same effect.

[19]    Judgment affirmed.


Kirsch, J. and Mathias, J., concur.