**Christopher M. ALLEN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 33A04–0305–CR–249.**

Court of Appeals of Indiana.

Aug. 9, 2004.

Transfer Denied Nov. 4, 2004.

Kevin P. McGoff, Maureen T. Keefe, Darlene R. Seymour, Kiefer & McGoff, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Christopher M. Allen appeals his convictions for three counts of Murder,[1] a felony, and one count of Robbery,[2] a class C felony, raising a number of alleged errors. Specifically, Allen asserts that the procedures involving the pre-trial identification of Allen as the suspect were tainted, that the trial court erred in refusing to allow him to present evidence demonstrating that someone else had committed the offenses, that he was denied his right to due process of law because the State unreasonably delayed in bringing charges against him, and that he was denied the right to a fair trial because the jury verdict was prejudiced by improper extraneous influences. Allen also asserts that reversible error occurred when counsel were not notified of ex parte communications between the judge and the jury, that the results of certain tests performed by the State prior to trial were improperly admitted, and that the evidence was insufficient to support the convictions.

In this appeal, we address the issues that amount to reversible error, those that might recur on retrial if the same is warranted, and Allen's sufficiency of the evidence claim. We conclude that the trial court's exclusion of a defense witness's testimony indicating that someone other than Allen had committed the offenses was reversible error. Similarly, we conclude that the trial court erred in excluding the results of certain tests that had been conducted as well as the testimony of an expert witness who had been retained by Allen. We also find that the trial court did not err in admitting pretrial and in-court identification evidence, that the trial court did not err in excluding the testimony of a witness who had died before the trial commenced, and that Allen was not denied due process as a result of the State's delay in filing the charges against him. Finally, we find the evidence sufficient to support Allen's convictions. Thus, we reverse and remand for further proceedings consistent with this opinion.

## FACTS

On the morning of August 25, 1990, Tracy Holvoet, Connie Zalewski, and Scott Dick were found shot to death at an Osco Drug Store in South Bend. The State alleged that "the perpetrator left the store in St. Joseph County at approximately 8:04 a.m." that day. Appellant's App. p. 2850. Prior to the shootings, Allen had resigned as the manager of the Osco on March 16, 1990, for embezzling money. Specifically, Allen had been accused of stealing cash, making long distance telephone calls on the company phone and over-billing for rental equipment. The total loss to the store amounted to approximately $5400, and Allen eventually made restitution to the store.

When Allen left Osco, his keys to the store were confiscated, and the locks on the safe were changed. Additionally, Osco personnel rendered the PIN number that Allen had used to operate the store's alarm system inoperable. The remaining locks on the front doors, the combination to the lower portion of the safe and the key to activate the dial on the lower safe were not changed. It was determined that Osco's

---

1. Ind.Code § 35–42–1–1.

2. I.C. § 35–42–5–1.

safe was one of "dual custody." Appellant's Br. p. 22. Specifically, the upper portion was available for daily use by the store's employees, and the lower section was for the armored car service. Employees made deposits in the lower portion of the safe during the day by dropping the money in a slot in the upper portion of the safe. There was to be no key to the combination dial for the lower portion of the safe in the store. Hence, the armored car driver would enter the store, unlock the dial allowing it to be spun, and the store manager would enter the combination to open the bottom portion of the safe so the driver could take the money.

The lower half of the safe had been accessed on Friday, August 24, when the armored car driver, Richard Andrysiak, came to the store. At that time, Andrysiak handed the key to the manager so the dial could be unlocked. The manager then ran the combination to open the bottom part of the safe. Andrysiak turned the handle, locked the safe, spun the dial off and then locked the dial with the key. The bottom part of the safe could not have been opened without a key. However, it was determined that the dial could be unlocked if the combination was not cleared from the dial and locked.

It was further revealed that seven or eight individuals had access to the safe keys at the armored car service. While Allen was employed at Osco, the store had a staff of forty-five employees. All of the keys to the lower portion of the safe were accounted for after August 25. On one occasion, a former Osco employee told Allen that a key to the bottom of the safe was in the store. While it was a violation of Osco's store policy to have a key to the safe, some of the employees saw Allen access the bottom of the safe and carry some of the keys.

Immediately after the shootings, it was discovered that Osco's safe had been opened, and $6421 in cash was missing. According to Osco's records, Dick, who was Osco's assistant manager, deactivated the store's alarm system at 7:36 on the morning of August 25. Dudeck, who owned a nearby dry cleaning store, saw Dick alive, just before 8:00 a.m. Dudeck acknowledged that Dick had attempted to take a dress to the cleaners for his wife, but he was unable to enter because that business had not yet opened.

It was also revealed that Alicia Ivories, an Osco employee, telephoned the store early on August 25, 1990, and told Dick that she was not coming in to work that day. Also, Amy Avery stopped at the store at approximately 7:30 a.m. on August 25, 1990, to purchase oil for her car, but she found that the store had not yet opened. When Avery tried to enter the store again at 8:02 a.m., she found that it was still closed. However, Avery walked up to the front doors, peered inside, and pounded on the glass. She briefly caught a glimpse of a man inside the store whom she thought may have been Allen. However, it was determined that Avery gave two conflicting statements. Six days after the murders, she was unable to identify the individual that she saw in the store. Thereafter, she saw Allen on television and called the prosecutor's office to inform them that the person they arrested was not the one she saw.

Fred McGill was inside the Osco store on August 25, 1990, around 8:20 a.m. His statement to the police indicated that he saw two women in the store. Apparently, Holvoet had directed McGill to the section of the store where the razor blades were displayed and then continued toward the back of the store. McGill did not buy the blades, so he left the Osco and went across the street to Kroger. A receipt from Kro-

ger indicated that McGill made a purchase there at 8:37 a.m. The information McGill provided to the police concerning the presence of the Osco store employees was corroborated by Marge Gaertner—another customer—who was also in the store. McGill died in 1995, and this information was never conveyed to the jury. Moreover, although Gaertner was on Allen's list of witnesses, he elected not to call her to testify at trial.

Also, there was evidence that Mary Jane Karczewski was waiting in her vehicle at a grocery store near Osco on the morning of August 25, and observed Zalewski and Holvoet enter the store just before 8:00 a.m. with a man that they appeared to know. Additionally, Cheryl Jackson, an Osco employee, arrived at the store just after 8:00 a.m. and found the front doors still locked. The locked doors were unusual, as it was customary for the doors to be unlocked for the employees to enter even though the store had not yet opened for business. Jackson also heard screeching tires coming from the back of the store, but she did not see a vehicle. Another Osco employee—Bernadette Claffey—noticed Dick's car parked close to the store, rather than in its usual location. Claffey then walked from the grocery store toward Osco at 8:18 a.m. after Jackson expressed concern to her that the store was still locked.

The two women walked around to the back of the Osco where they discovered that the rear service doors were open and that the alarm was sounding. An examination of the doors revealed that the vertical rods, which operated the top and bottom latches of the doors, were bent and disconnected, which indicated that the doors would not properly close on the date of the murders. The women then returned to the grocery store and contacted Phillip Canoy, a South Bend police officer, who was working security at the grocery store. Officer Canoy then called for back-up, whereupon Officer Joseph Markovick arrived. They entered the store at approximately 8:20 a.m., where they discovered the victims' bodies.

When the police investigators arrived at the scene, they discovered a bloody note next to Dick's body that appeared to indicate that the armored car driver had been the perpetrator of the offenses. The words on this note indicated "white man armor car [sic] uniform & badge." Appellant's App. p. 2791. Police investigators examined the note in May 2001. Bonnie Beal, of the Indiana State Police Laboratory, found "it is less than probable that" Allen had written the note, appellant's App. p. 2794, although she did conclude that Allen could have written the words "white man" on the note. Appellant's App. p. 2795. An expert for Allen also testified that it was "very unlikely that Mr. Allen ... was responsible for writing any portion of the questioned bloodied note." Other witnesses, however, acknowledged that portions of the writing on the note looked like Allen's handwriting.

Additionally, the police compared 198 footprints lifted from the crime scene with Allen's shoes, but there were no matches. Fingerprints had also been lifted from the service doors. Of the 237 "lifts" that were made, it was determined that seventy-four fingerprints and thirty-three palm prints were "of value." Tr. p. 315. Two of the fingerprints matched Allen's, and a partial palm print found on the doors' crash bar matched Allen's. An FBI analyst testified that he could not state with any certainty whether the prints had been there for "five months, five minutes or five years." Appellant's App. p. 2836, 2837–38. Additionally, the State offered no evidence of fingerprints found on the safe, the iron bar or the front doors of the store. It was con-

cluded that the iron bar, which took some two hands to lift, had to be removed in order to exit the receiving doors.

Further investigation revealed that on the morning of August 25, Jody Rannells left her home in Walkerton for a 9:00 a.m. hair appointment in Mishawaka. Her residence is located approximately twenty miles south of South Bend. She stopped at her bank shortly before 8:00 a.m., conducted her business, and left. Shortly thereafter, at about 8:17 a.m., Rannells observed another car fast approaching an intersection. She noticed that the driver was an African–American male who appeared to be in his twenties with short hair. Rannels also noticed that the driver had wide-open "wild eyes." Tr. p. 333, 358–61. She described the vehicle as a two-door Ford Taurus that did a "fast roll-through" the intersection. Appellant's App. p. 2858. She later identified the driver of the vehicle—who she had observed for approximately three seconds—as Allen. It was determined that the location where Rannels said she saw Allen was southwest of Osco and not on a direct route from South Bend to Indianapolis. It was also learned that Ford had never produced a two-door model Taurus.

Upon learning of the Osco murders, Rannells was put in contact with South Bend Police Officer Richard Bishop who met with her on September 12. Officer Bishop showed her a photo array that contained five "mug shot" photos, along with Allen's photograph that originated from Osco's personnel file. All six photographs were of young African–American males. All had mustaches and their faces and hairstyles were not greatly dissimilar. Only one of the photos depicts a portion of a chain that holds the jail booking information. Additionally, two of the subjects—in addition to Allen—were wearing white shirts, although Allen does appear to be wearing some type of "dress" shirt. However, there is no indication from the photograph that suggests Allen was an Osco employee. In the end, Rannells selected Allen's photograph as the man she saw at the intersection on August 25.

Allen retained William Lumkin, an expert to demonstrate that Rannells could not have seen the driver of the vehicle that had passed her. Lumpkin performed various reconstructive tests that were videotaped based upon the statements and the testimony given by Rannells prior to trial. However, Lumpkin was not permitted to testify following Allen's offer of proof.

On September 11, 1990, Allen was stopped near his home in Indianapolis and was interrogated by South Bend police regarding the Osco murders. On that same day, the police questioned Allen's wife—Sharries Garrett—at her place of employment. Both Allen and Sharries maintained that he was at home throughout the night and early morning hours on August 24–25, 1990, and that they had attended a picnic in Indianapolis during the afternoon of August 25.

In November 1991, after the investigation was substantially complete, the police chief wrote Prosecutor Michael Barnes[3] urging him to "charge the case." Appellant's App. p. 2295–96. Barnes refused, and indicated that at that point he would have to omit relevant facts and circumstances in the probable cause affidavit, and that he could "not ethically do that." Appellant's App. p. 2298.

3. Michael Barnes is currently a judge on this court who took office in May of 2000. While he is a member of our court, he is not on the panel in this case. Moreover, Judge Barnes has been excluded and will continue to be excluded from any participation or consideration of this appeal.

Thereafter, in 1996, Christopher Toth, as counsel for Phyllis and Maurice Holvoet, the parents of one of the victims, instituted an action against Barnes. The lawsuit was an attempt to have the case either assigned to a special prosecutor or—in the alternative—presented to a Grand Jury. Toth sought production of the entire file relating to the Osco investigation and wanted to conduct additional discovery. After the trial court ruled against Toth and granted a protective order in favor of Barnes, the action was appealed to this court and we affirmed. *Holvoet v. State*, 689 N.E.2d 469, 470–71 (Ind.Ct.App. 1997).

Thereafter, Toth ran for St. Joseph County Prosecutor in 1998, promising to "prosecute the Osco Murders." Appellant's App. p. 2740–44. Toth was elected and took office on January 1, 1999. A grand jury indictment was then returned on November 8, 1999, against Allen, but it was dismissed because the State failed to conduct the process in the proper fashion. Thereafter, Toth signed an information bringing the charges against Allen which was supported by a probable cause affidavit signed by Michael Swanson, who Toth had hired as Commander of the Special Crimes Unit.

Allen then sought a special prosecutor, alleging that Toth had a conflict of interest, which the trial court denied. Thereafter, on October 11, 2000, Toth moved for the appointment of a special prosecutor that was granted. Two deputy prosecutors from Allen County were appointed and assigned to the case.

On April 25, 2000, Allen was charged with the above offenses as well as additional counts of felony murder. After a jury trial on June 22, 2001, the trial court declared a mistrial because the jurors were unable to reach a verdict. Thereafter, on June 12, 2002, a second jury trial commenced.

At some point during the trial, Curtis Crenshaw, an inmate incarcerated at the Wabash County Correctional Facility, was called as a defense witness. A hearing was conducted outside the jury's presence for the purpose of determining whether Crenshaw was "available" to testify in accordance with Indiana Evidence Rules 804(a) and (b)(3), which contain exceptions to the hearsay rule. Crenshaw invoked his Fifth Amendment privilege when asked: if he was at the Osco on August 25; if he ever told Steven Bethel, another incarcerated inmate, that he was involved in the crimes that had occurred; his address on August 25; the type of vehicle he was driving at that time, and if he had ever been in the Osco store before August 25.

Bethel also gave testimony outside the presence of the jury after Crenshaw had asserted his privilege. When asked what had occurred at Osco, Bethel responded, "I know that he didn't do it, Allen. I know for sure of that." Appellant's App. p. 2634.

It was revealed that Bethel and Crenshaw had gone to Osco several days before the murders. At that time, Crenshaw cased the store while Bethel stayed at the front doors where he purchased some gum from a machine that was just inside the entrance. Bethel stayed in this area while Crenshaw walked the store aisles. Together, they observed the back doors. Crenshaw stated "it would be an easy spot because it's hidden like ... it's basically got buildings beside it. It's like in the blind somewhat, if it's at the right time." Appellant's App. p. 2635–36. On the morning of the murders, Bethel was at his sister's home, only blocks from Osco. Bethel was outside the home when Crenshaw approached on foot from the direction of Osco. While Bethel was not sure of the

time, he acknowledged that "the city buses had started running." Tr. p. 613. Crenshaw told Bethel "he had just got some money and some people got hurt and got killed in it, and he had to—he couldn't tell me everything. He had to talk to me later on." Appellant's App. p. 2642. Bethel heard "that the Osco stuff had happened" on the news later that morning. Appellant's App. p. 2643–44. That evening, Crenshaw told Bethel "it was a situation gone bad ..." "Three people ended up dead because of the robbery, and they really didn't need to end up dead." Appellant's App. p. 2645.

That same evening, Bethel offered to buy a handgun that Crenshaw had shown him. Crenshaw refused to sell it to him, and indicated that "the gun was dirty [and he needed to get] rid of it." Appellant's App. p. 2648–49. Crenshaw had defined a "dirty" weapon as one having "a body attached to it, or bodies, or somebody knew of the gun." Appellant's App. p. 2647–49. Bethel then saw Crenshaw toss the gun into the St. Joseph River, and he later approached the authorities with the information that he had about the Osco crimes after his arrest in March, 1991. Bethel told them where the gun could be located, but he did not reveal all the information he had learned about the crimes.

Following this hearing, the trial court found Crenshaw unavailable and Bethel was permitted to testify. During the course of his direct examination, when asked to recount what Crenshaw told him the morning of the crimes, Bethel stated that he felt by answering the question he would "put his life in danger," and his testimony was halted. Appellant's App. p. 2657. The trial court characterized this episode as a "refusal to cooperate with the query being put to him by defense counsel," following an in camera inquiry of Bethel. Appellant's App. p. 2658. Thus,

Bethel's testimony was stricken from the record, and the jury was admonished not to consider it as part of the evidence. Appellant's App. p. 2659–60. Allen then sought to have Bethel's prior testimony admitted, but the State objected and the trial court excluded it.

Interestingly, there was no indication that Crenshaw's prints had—or had not been—compared to those that had been lifted at the scene. Crenshaw had been implicated in the crimes, and he would not otherwise have had access to the bar on the back door of the store. Thus, the jury was not made aware of whether Crenshaw's prints were present at Osco. Also, no murder weapon was produced at the trial. An FBI laboratory technician testified that the five projectiles recovered from Osco were ".44 caliber cast lead bullets," and he did not know whether the bullets had been fired from the same weapon. Tr. p. 413–14. The technician acknowledged that they could have been fired from a single shot Thompson Contender or a five-shot Charter Arms Bulldog .44 Special. Tr. p. 415, 417–19. Additionally, several witnesses acknowledged that Allen had shown them a pistol that he kept in the compartment behind the passenger's seat in his vehicle. In a taped statement, one of the witnesses told the police that the gun "was a .45." Tr. p. 1387–89.

During the course of the investigation, it was revealed that after Allen's father died, he came into possession of a .38 caliber pistol and a rusty double-barreled shotgun. Because Allen's wife disliked firearms, Allen kept the pistol in his vehicle. However, at some point, Allen decided to dispose of the pistol. Hence, in late July or early August 1990, he removed the cylinder, and wrapped it in paper and tape. Allen then did the same thing with the gun and tossed

them both in an Indianapolis apartment complex dumpster.

Allen testified at the trial that he had gone fishing on August 24. When he returned to his Indianapolis home, Sharries was not there, but Allen eventually located her at a nearby video store around midnight. Allen testified that he went to bed around 2:00 or 3:00 on Saturday morning, and Sharries came to bed around 4:30 a.m.

It was also determined that the Allens had planned to attend a picnic on Saturday—the 25th—that was to begin around noon. A friend of the family, Geraldine Blakely, called the Allen residence at 8:00 a.m., and talked with Sharries to ensure that she would be ready to leave for the party by 11:00 that morning. Allen was in bed when Blakely called.

Nancy Harris, who was in the house when Blakely called, testified that Allen was in the house at the time of the call. She first acknowledged that the telephone conversation between Sharries and Blakely occurred sometime during "mid-morning" on August 25. However, Harris subsequently recalled that she woke up "around 8" after hearing Sharries talking on the telephone. She also remembered that at some point that morning, Allen went to Marsh where he purchased some doughnuts. Tr. p. 1188–89; 1192–96.

Eventually, Blakely, Allen and Sharries went to the picnic at Allisonville Road and 116th street in Indianapolis, where they spent the afternoon. Blakely had a video camera that she took to the picnic and both Allen and Sharries appear in the videotape at this outing. That video had not been retrieved by police officers until sometime in 2000.

Allen and his wife divorced in 1991. It was not an amicable breakup and Sharries has not spoken with Allen since the dissolution. Throughout the course of the investigation, police detectives spoke with Sharries on a number of occasions and, at some point, they discussed a $100,000 reward for information about the murders. The investigators told Sharries that if "anything changed, they were offering a reward." Appellant's App. p. 2721. The FBI investigators also discussed the possibility of immunity for Sharries. However, each time Sharries was questioned by the police, she always maintained that Allen had been in bed when she retired for the "evening," on August 25, and that he was there when she awoke later that morning.

Throughout the investigation, Detective Michael Swanson of the South Bend Police Department as well as other law enforcement officers pursued Allen as a suspect in the crimes. For instance, Detective Swanson would visit Allen's residence and place of employment, and leave his business card on the window of Allen's vehicle. Also, in December 1990, Detective Swanson anonymously sent Allen a Christmas card that contained the following typewritten message: "FROM ALL YOUR FRIENDS AT OSCO'S (sic) PAST, PRESENT AND DECEASED. HAVE A MERRY CHRISTMAS AND A(sic) WE ALL HOPE TO SEE YOU BACK HERE IN SOUTH BEND REAL SOON." Appellant's App. p. 2731–33, 2734–36.

At the conclusion of the trial on June 22, 2002, Allen was found guilty on all counts, and was subsequently sentenced to an aggregate term of 144 years. Allen then filed a motion to correct error alleging juror misconduct, which the trial court denied. Allen now appeals.

## DISCUSSION AND DECISION

### I. Pre-trial Identification; Photographic Array

Allen argues that the trial court erred in admitting pretrial and in-court identifica-

tion evidence purportedly establishing that Allen had committed the offenses. Allen asserts that the photo array shown to Rannells was unduly suggestive and no independent basis existed for her in-court identification of Allen.

■ In resolving this issue, we first note that the admission of evidence is within the trial court's discretion and the decision is reviewed for an abuse of discretion. *Hyppolite v. State*, 774 N.E.2d 584, 592 (Ind.Ct.App.2002), *trans. denied*. We also observe that the identification of a defendant must comport with the standards of due process. *Williams v. State*, 271 Ind. 656, 395 N.E.2d 239, 243 (1979). If an out-of-court identification procedure was unduly suggestive, then the testimony relating to it is inadmissible. *Farrell v. State*, 622 N.E.2d 488, 493 (Ind.1993). In essence, this court must determine whether, under the totality of the circumstances, the identification process was conducted in such a manner that it created a substantial likelihood of irreparable misidentification. *Id.* Our supreme court has held that a photo array is impermissibly suggestive only where the array is accompanied by verbal communications or the photographs in the display include graphic characteristics that distinguish and emphasize the defendant's photograph in an unusually suggestive manner. *Bell v. State*, 622 N.E.2d 450, 455 (Ind.1993).

■■ When analyzing the propriety of the pre-trial identification procedure here, the first issue we must address is whether the out-of-court procedure was conducted in a fashion that led the witness to make a mistaken identification. *Brooks v. State*, 560 N.E.2d 49, 55 (Ind.1990). If it is unduly suggestive, we then address the second question, which is whether the witness had an independent basis for the in-court identification so as to make it admissible. *Hyppolite*, 774 N.E.2d at 594.

■ As set forth above in the *FACTS*, Officer Bishop of the South Bend Police Department met with Rannells and showed her a photo array that included Allen's photograph. While Rannells had learned of the Osco murders, the evidence showed that Officer Bishop did not provide her with any information regarding the case. Rather, Officer Bishop asked Rannells whether she recognized anyone from the six photographs that were displayed to her.

Additionally, the photographs contained in the array were all of African–American males with mustaches. Their faces and hairstyles were somewhat similar and, contrary to Allen's argument, there is nothing in Allen's photograph that identifies him as an Osco employee. Inasmuch as the array was not accompanied by verbal communications from the police officers, and there were no graphic characteristics that distinguished or emphasized Allen's photograph in an unusually suggestive manner, we conclude that Rannells's pretrial identification evidence was properly admitted, and Allen's claim with respect to this issue must fail. Additionally, because we hold that the pretrial identification evidence was properly admitted, it is not necessary to address whether Rannells had an independent basis for her in-court identification of Allen. *See Harris v. State*, 716 N.E.2d 406, 410–11 (Ind.1999).[4]

---

4. While Allen discusses the substance of Amy Avery's identification testimony in his brief, he does not attack it as "unduly suggestive" or prejudicial to the extent that a reversal is warranted, or that an error even occurred.

To the contrary, Allen states that "[t]he information provided by Avery was of no value. The prosecution did not even mention her in its final argument." Appellant's Br. p. 81.

## II. Exclusion of Evidence

Allen next claims that the trial court erred in excluding evidence that was favorable to his defense. Specifically, Allen maintains that Bethel's testimony that Crenshaw and other individuals had actually committed the crimes should have been admitted at trial, that the exclusion of Fred McGill's testimony indicating that he saw Holvoet alive at a time that the State asserted she was already deceased was error, and that the reconstructive and experimental evidence offered by William Lumpkin regarding Rannells's testimony placing Allen in some proximity to Osco was improperly excluded.

■ In resolving these issues, we note "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Kubsch v. State,* 784 N.E.2d 905, 924–25 (Ind.2003) (quoting *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). As our United States Supreme Court has observed:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Additionally, it has been held that a defendant has a right to present evidence tending to show that someone other than the accused committed the charged crime and that the exclusion of such evidence by the trial court "appears inconsistent with substantial justice and therefore cannot be deemed harmless error." *Joyner v. State,* 678 N.E.2d 386, 390 (Ind.1997). When the State excludes competent, reliable evidence that is central to the defendant's case, this right is abridged. *Crane,* 476 U.S. at 690, 106 S.Ct. 2142.

■ We also note that the standard of review for admissibility of evidence issues is whether the trial court's decision was an abuse of discretion. *Butler v. Kokomo Rehabilitation Hosp., Inc.,* 744 N.E.2d 1041, 1046 (Ind.Ct.App.2001), *trans. denied.* The decision whether to admit evidence will not be reversed absent a showing of manifest abuse of a trial court's discretion resulting in the denial of a fair trial. *Brand v. State,* 766 N.E.2d 772, 778 (Ind.Ct.App.2002), *trans. denied.* Generally, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *Coleman v. State,* 694 N.E.2d 269, 277 (Ind.1998). In determining whether an evidentiary ruling affected a party's substantial rights, the court assesses the probable impact of the evidence on the trier of fact. *Id.* However, as noted above, if error results from the exclusion of evidence which indicates that someone else had committed the crime, the error cannot be deemed harmless. *See Joyner,* 678 N.E.2d at 390.

### A. Exclusion of Bethel's Testimony

Here, Allen argues that the trial court erred "when it failed to allow Stephen Bethel to continue to testify, without further inquiry on the record as to his willingness to testify." Appellant's App. p. 2019. In particular, Allen contends that the trial

court erroneously excluded Bethel's statement he had given outside the presence of the jury indicating that Crenshaw and some other individuals were the actual perpetrators of the murders.

In accordance with Indiana Evidence Rule 802, an out-of-court statement offered to prove the truth of the matter asserted is typically not admissible into evidence. However, in accordance with Indiana Evidence Rule 804(b)(2), such testimony is admissible as an exception to the hearsay rule if the declarant is unavailable as a witness and gave testimony at another hearing in the proceedings where the opposing party had the opportunity to examine the witness. A witness is deemed "unavailable" if he persists in refusing to testify concerning the subject matter of his statement, despite a court order to do so. *Diggs v. State*, 531 N.E.2d 461, 464 (Ind. 1988).

As recounted in the *FACTS*, Bethel testified outside the presence of the jury that he and Crenshaw were together and "cased" the Osco store several days before the crime. Appellant's App. p. 2879–81. Crenshaw communicated to Bethel that [the Osco] would be "an easy spot" because of the location so long as "it's at the right time." Appellant's App. p. 2879–80. Bethel went on to testify that on the morning of August 25, 1990, after the buses began to run, Crenshaw and two others approached Bethel coming from the direction of Osco. Bethel had been at his sister's residence, only blocks from the store. Crenshaw related to Bethel that "he had just got some money and some people got hurt and got killed in it, and he couldn't tell me everything. He had to talk to me later on." Appellant's App. p. 2884. After Bethel had heard of the Osco murders on the television news, Crenshaw told him at some point during the evening of August 25, that the situation had "gone bad" and

"three people ended up dead because of the robbery, and they didn't really need to end up dead." Tr. p. 621.

Bethel also acknowledged that on the evening of August 25, Crenshaw paid cash for rooms at a South Bend hotel where he and Bethel stayed with three women. Tr. p. 618. Crenshaw also showed Bethel a handgun that resembled a .44 Charter Arms Bulldog. Crenshaw refused to sell it to Bethel, telling him that it was "dirty," meaning it had "a body attached to it, or bodies." Appellant's App. p. 2887, 2889. Bethel then testified that he saw Crenshaw toss the gun into the river. Appellant's App. p. 2887, 2889.

During the course of a statement that Bethel had given to Detective Swanson on December 9, 1991, Bethel informed him of other crimes that had occurred in Bloomington. This information was confirmed by Swanson to be accurate. Appellant's App. p. 2419.

When Bethel gave his testimony outside the presence of the jury, he was under oath and was subject to cross-examination by the prosecutors who were trying the case. The trial judge also examined Bethel during the course of this hearing to determine the admissibility of his testimony upon a finding that Crenshaw was unavailable when he had asserted his Fifth Amendment right against self-incrimination. After Allen called Bethel as a witness and began to testify, Bethel balked and professed fear for his safety. Appellant's App. p. 2895. As a result, the trial judge decided that he would not permit Bethel to appear again before the jury and instead offered that Bethel could testify by deposition if he would cooperate. However, Bethel refused to do so, and the trial court struck the testimony.

In response to Allen's argument that excluding the testimony given outside the

jury's presence was error, the State first maintains that the issue was waived because Allen "made neither a timely and specific objection on the record to the trial court striking the testimony, ... nor an offer of proof on the record for admitting Bethel's testimony." Appellee's Br. p. 14.

 In addressing this issue, we note that the purpose of an offer to prove is "to preserve for appeal the trial court's allegedly erroneous exclusion of evidence." *Arhelger v. State*, 714 N.E.2d 659, 665 (Ind.Ct.App.1999). An offer of proof can precede or follow the ruling on the admissibility of the evidence. *Id.* Additionally, an offer of proof must make the substance of the excluded evidence or testimony clear to the court. It must identify the grounds for admission of the testimony, and it must identify the relevance of the testimony. *Id.* at 666. However, the offer of proof need not be formal. *Id.*

Allen points out, and we acknowledge, that Bethel was not cross-examined, and the trial court halted his testimony before the direct examination had concluded. In essence, there was no basis for an objection to the trial court's admonishing the jury to disregard Bethel's partially elicited testimony, and Allen has not waived anything by not objecting to the exclusion of this testimony.

 In a similar vein, the State goes on to argue that Allen failed to make "an offer of proof on the record for admitting Bethel's testimony," thus further waiving any claim of error predicated on the exclusion of Bethel's prior sworn testimony. Appellee's Br. p. 14. Notwithstanding this claim, the offer to use Bethel's testimony was made part of the record by an order issued by the trial court on January 21, 2004. Appellant's App. p. 2597–99. The order specifically acknowledged that defense counsel "requested that the jury be permitted to hear Bethel's testimony taken outside the presence of the jury at the hearing held on Friday, June 14, 2002." Appellant's App. p. 2599. Moreover, during the course of the hearing that took place prior to the court's ruling that Bethel could testify before the jury, Allen's legal justification for the introduction of Bethel's testimony was set forth as well as the substance and relevance of that evidence. As a result, there is no merit to the State's argument that Allen has waived the issue.

 In our view, the record supports a conclusion that Bethel's testimony was exculpatory, unique, and critical to Allen's defense. There was no other source for Allen to rely upon to present this part of his defense that another individual had committed the crimes.

Under these circumstances, we must conclude that Allen had the right to present evidence that Crenshaw was involved in the commission of the crimes. Such evidence goes to the very heart of this fundamental right, and the trial court's exclusion of Bethel's testimony made outside the presence of the jury impinged upon Allen's right to present a complete defense. Hence, we reverse Allen's convictions on this basis.

### B. *McGill's Testimony*

Allen also contends that excluding evidence that McGill saw Holvoet at a time the State asserted she was deceased was error. In particular, Allen argues that the exclusion of McGill's testimony denied him the right to present a defense.

As noted above, McGill provided information in a sworn statement—substantiated by Swanson—that he was inside the Osco on the morning of the murders. McGill entered the store through the unlocked front doors at about 8:15 or 8:20 a.m. and saw two women inside: a Caucasian that "looked like she was working

there," and a "black girl about in her late 20's standing behind a counter in the camera section." Appellant's App. p. 2326, 2329. It was established that the woman working at the store was Holvoet, the pharmacist. Appellant's App. p. 2332. After leaving the store, McGill went across the street to a Kroger store and purchased some items. A store receipt indicated that he made his purchase at 8:37 a.m. Appellant's App. p. 2326.

■ Inasmuch as McGill had died before the trial commenced, Allen attempted to present the evidence obtained from McGill through the testimony of Detective Swanson. Tr. p. 1525–30. In accordance with the State's objection, the trial court excluded McGill's purported testimony as hearsay and further determined that the probative value of that evidence was outweighed by its tendency to confuse the issues. Tr. p. 1525–30.

Indiana Evidence Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Although there are well-established exceptions to the hearsay rule that permit the introduction of evidence under some circumstances, Allen does not claim that the McGill evidence should have been admitted under some well-defined exception to the rule. To be sure, Allen acknowledges the following in his reply brief: "As the state points out, Det. Swanson testifying as to what McGill said in his sworn statement would have been hearsay. This is not in dispute." Appellant's Reply Br. p. 9. *See Garner v. State,* 777 N.E.2d 721, 724 (Ind. 2002) (recognizing that deposition testimony of an absent witness offered in court to prove the truth of the matter asserted constitutes classic hearsay). Inasmuch as Allen has not argued the admissibility of the evidence in accordance with any of the well-known exceptions to the hearsay rule, we reject his contention that the evidence should have been admitted simply because the facts of this case "are unique." Appellant's Reply Br. p. 10. Under these circumstances, we cannot say that the exclusion of the McGill evidence was error.

### C. Exclusion of Reconstructive Evidence and Testimony

We go on to address Allen's contention that the trial court erred in excluding certain reconstructive evidence and testimony that had been offered by William Lumpkin, an expert retained by Allen who challenged Rannells's identification of Allen while she drove through an intersection on the morning of the murders. In particular, Allen maintains that the evidence regarding tests, experiments and re-enactments of the scene relating to his alleged proximity to the crimes should have been admitted because the conditions that were recreated were substantially similar to those that existed at the time of the incident.

■ In resolving this issue, we note that reconstructive evidence has been defined as "evidence offered to recreate conditions substantially similar to those existing at the time of the issue being litigated." *Wise v. State,* 719 N.E.2d 1192, 1196 (Ind.1999). Whether the conditions present at the time of the incident in question have been sufficiently duplicated is of critical concern for the admission of reconstructive evidence. *Id.* However, it is not essential that the conditions be precisely reproduced in all their details, and any departure goes to the weight rather than the admissibility of the evidence. *Vandalia R. Co. v. Duling,* 60 Ind.App. 332, 109 N.E. 70 (1915). This court will reverse a trial court's decision regarding the admission or exclusion of expert opinion evidence only for an abuse of discre-

tion. *Cook v. State,* 734 N.E.2d 563, 570 (Ind.2000).

In this case, Lumpkin, who had been trained in law enforcement and as an engineer, essentially recreated the conditions that Rannells described in her pretrial statements. Those conditions were recreated for purposes of testing whether it was possible for one individual to identify another when two moving vehicles passed through the intersection as Rannells had described. Lumpkin interpreted and duplicated the setting, using Rannells's four pretrial statements to recreate the episode. Appellant's App. p. 2920–23. In particular, Lumpkin conducted and videotaped his "on scene" investigation on August 25, 2001. The State objected, and the trial court ruled that Lumpkin could not testify because there was a danger of misleading the jury and because he had omitted critical variables as testified to by Rannells. Tr. p. 1277–8.

Allen then made an offer of proof describing the precise methods and procedures that he used in conducting the tests. Appellant's App. p. 2924–37. Lumpkin used mid-sized vehicles with body styles similar to those described by the witnesses for use in a reenactment at the intersection of Highway 23 and Crumstown Road. Appellant's App. p. 2921. The vehicles were "positioned around and driven through the intersection in accordance with the derived data." Appellant's App. p. 2921. A video camera was then used to record the images in each observation. Lumpkin concluded that, based upon these tests, "rapid deceleration prevented the observation from being made safely." Appellant's App. p. 2922. Thus, Lumpkin determined that at no time "did [he] find the driver of the subject vehicle to be clearly visible, discernable or recognizable." Appellant's App. p. 2922.

In these circumstances, it is apparent that Lumpkin's testimony, the tests he conducted, and the video he prepared, were based on particular evidence in the case. Specifically, Lumpkin used the prior testimony and statements that Rannels had made to law enforcement personnel to create the video. In essence, Allen sought to admit expert evidence based upon factors that Lumpkin knew, all of which were based upon the statements and prior testimony.

That said, the situation here is quite unlike those cases where random hypothetical questions were posed to a witness, none of which were based upon facts in evidence. *See Krumm v. State,* 793 N.E.2d 1170, 1185 (Ind.Ct.App.2003) (holding that the trial court properly sustained an objection to a hypothetical question as to whether the victim could "come up with some kind of sexual history" when the question was based upon facts that had not been established by the evidence). We also note that in *Kubsch,* a police detective was permitted to testify that, "it's been my training that oftentimes when a victim's face is covered, it's done to disassociate the victim from the suspect. It turns the victim from a person to an object." 784 N.E.2d at 922. In concluding that allowing such testimony was error in these circumstances, our supreme court observed that:

> Detective Richmond's opinion that when a victim's face is covered it is often done to disassociate the victim from the suspect and that it happens more in cases where the victim and suspect know or have a relationship with each other, was not rationally based upon his perceptions. There was nothing that Detective Richmond either saw or heard at the scene of the crime, or became aware of through his other senses, that supported the basis for his opinion. Rather, the detective's opinion was based on his un-

derstanding of a phenomenon which the State in this case has not shown to be scientifically reliable.

*Id.* at 922.

Like the circumstances regarding the exclusion of Bethel's testimony, it is apparent that Lumpkin's testimony was critical to Allen's defense in establishing that he could not have been the driver of the vehicle she observed on the morning of August 25. In our view, the trial court abused its discretion in excluding the admissibility of the tests and Lumpkin's testimony regarding the results of those tests. Such was the type of evidence that prevented Allen from presenting "a meaningful opportunity to present a complete defense." *Kubsch,* 784 N.E.2d at 924–25. As a result, we also reverse upon this basis.

### III. Denial of Due Process

Allen next argues that the trial court erred in denying his motion to dismiss the charges that were brought against him in light of the State's unreasonable delay in pursing the case against him. Specifically, Allen claims that the State's lengthy delay in bringing him to trial resulted in the denial of due process because several of the material witnesses were no longer able to recall relevant details, and two "crucial" witnesses, Hattie Byers—who was Crenshaw's sister—and Fred McGill, had died before the trial. Allen also asserts that because various telephone records and motel receipts were no longer available at the time of trial, and that the prosecutor's delay in bringing the charges denied him the right to due process.

▆▆▆ In resolving this issue, we note that a defendant may be afforded relief in a pre-indictment delay situation. However, that provision has a limited role in protecting against oppressive delay. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). To obtain relief, the defendant is required to make a threshold showing that he suffered actual and substantial prejudice to his right to a fair trial. *Id.; see also Plowman v. State,* 604 N.E.2d 1219, 1221 (Ind. Ct.App.1992), *trans. denied.* Should a defendant overcome that burden, he must then demonstrate that the State had no justification for the delay. *See Plowman,* 604 N.E.2d at 1221. The mere passage of time is not presumed to be prejudicial, and to satisfy the threshold burden of prejudice, a defendant must make specific and concrete allegations of prejudice that are supported by the evidence. *United States v. Spears,* 159 F.3d 1081, 1084 (7th Cir. 1998).

▆▆ Allen alleges that because Crenshaw and Hattie Byers may have been involved in the crimes and Byers had died in 1994, he was denied due process because her testimony was unavailable at trial. Notwithstanding this contention, Allen has failed to show that he was prejudiced by Byers's lack of testimony in light of her death. To be sure, it is apparent that Allen's only use for Byers's testimony was to establish that she was a perpetrator of the crimes. In light of these circumstances, it is highly unlikely that Byers would have testified at the trial admitting her guilt regarding her participation in the offenses. Hence, Allen's claim fails on this basis.

▆▆ Allen goes on to argue that McGill's death before the trial contributed to the denial of his right to due process. As noted above, Allen established that McGill would have testified that he was present in the Osco store conversing with Holvoet at the time that the State alleged the murders had already occurred. Gaertner, another customer in the store, would have testified to essentially the same information, but Allen chose not to call her as a

witness at trial. Tr. p. 1527, 1530. Thus, McGill's testimony would have been cumulative of Gaertner's testimony had she testified. As the *Spears* court observed, the absence of cumulative testimony cannot, as a matter of law, constitute actual prejudice. 159 F.3d at 1085–86. As a result, Allen's due process claim on this basis may not succeed.

We also note that any prejudice that might have inured to Allen resulting from the absence of McGill's testimony will essentially be cured by the admission of Bethel's testimony upon retrial if, in fact, one is warranted. As observed above, Bethel testified outside the jury's presence that Crenshaw admitted that he was directly involved in the commission of the crimes, and that "Allen didn't do it." Appellant's App. p. 2634, 2884; Tr. p. 621. In our view, this evidence—along with the alibi evidence that Allen offered at trial—minimizes the impact of the testimony that McGill would have offered, i.e. that he had seen Holvoet alive on the morning of August 25.

■ We also note that while Allen alleges that he was denied due process because various telephone records and motel receipts regarding Crenshaw and Byers's activities were not available at the trial, such evidence would only have shown that Crenshaw paid for a motel room and that telephone calls were made. To be sure, this evidence would not have demonstrated that Allen did not commit the crimes. As a result, the lack of such documentation does not rise to the level of actual and substantial prejudice. *See Patterson v. State*, 495 N.E.2d 714, 718 (Ind.1986) (observing that missing evidence that would not necessarily prove the defendant's innocence does not show actual prejudice).

■ In further support of his claim that he was denied due process, Allen argues that had there been less of a delay, three other witnesses—Nancy Harris, Geraldine Blakely, and Lisa Ivories—would have fared better in presenting their testimony at trial because they could have recalled the events in greater detail. Notwithstanding such a contention, this court observed in *Plowman* that the mere allegation that the passage of time impaired witnesses' memories is not sufficient to establish prejudice. 604 N.E.2d at 1221. Moreover, Blakely testified at trial that she in fact had telephoned Sharries at 8:00 a.m. on August 25. Tr. p. 1168–69. Hence, the pre-indictment delay in this case had no effect on her testimony. Additionally, Allen's complaint that there was no recorded statement by Blakely closer in time to the murders does not establish prejudice from the delay because Allen could have taken a recorded statement from Blakely at any time.

Similarly, while Nancy Harris may have been somewhat uncertain about the time that Blakely telephoned and talked with Sharries, she testified that the call had come in sometime during the morning of August 25. Tr. p. 1188–89, 1192–96, 1199–1202. Thus, even though Harris's memory of the precise time that Blakely's telephone call was made might have diminished over the years and left her vulnerable to impeachment, we cannot say that such a circumstance rose to the level of actual and substantial prejudice. In our view, Allen's apparent argument that Harris would have been a better witness had the trial been held earlier, is without merit.

Also, Lisa Ivories, one of the employees at the Osco store, testified that she had spoken with Scott Dick at the Osco store on the morning of August 25. Ivories informed Dick that she was not going to come to work that day. Tr. p. 1303–08. As with Harris, Ivories was not absolutely certain about the time that she talked with Scott Dick. Again, this claim amounts to

nothing more than a claim of diminished memory that does not amount to actual and substantial prejudice.

▮ Finally, Allen asserts that he was denied his right to due process because the State had some type of impermissible motive for its delay in filing the charges against him. We note that a prosecutor is vested with broad discretion in the performance of his duties, and such discretion includes the decision of whether and when to prosecute a suspect. *See Holvoet v. State*, 689 N.E.2d 469, 472 (Ind.Ct.App. 1997), *trans. denied.* Moreover, "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." *Lovasco*, 431 U.S. at 790, 97 S.Ct. 2044. Rather, the defendant must demonstrate that the delay violated fundamental concepts of justice. *See id.*

▮ Additionally, prosecutors are not under a duty to bring charges as soon as probable cause exists. *Id.* at 791, 97 S.Ct. 2044. A prosecutor's belief that further investigation is warranted to solidify the case is a reason for a pre-indictment delay. *See United States v. Sowa*, 34 F.3d 447, (7th Cir.1994). It is proper for a prosecutor to delay filing charges "until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Lovasco*, 431 U.S. at 795, 97 S.Ct. 2044.

▮ In this case, it is evident that Michael Barnes—the St. Joseph County prosecutor on August 25, 1990—was aware that Allen was a suspect in the murders. Tr. p. 1571. However, it was also apparent that Prosecutor Barnes believed that the evidence available in this case during his tenure as prosecutor was not sufficient to obtain a conviction. Appellant's App. p. 132, 176–77, 180, 184–85. Even though the

evidence may have been enough to establish probable cause, such is not the determinative factor in deciding whether to bring charges against a defendant. As discussed in the issues above, the circumstances here indicate that the delay in the decision to prosecute Allen aided in the search for the truth, and Allen has failed to make a showing of any impermissible reason for the pre-indictment delay. Therefore, Allen has failed to show that his due process rights were violated on this basis, and the trial court properly denied his motion to dismiss the charges.

## IV. Sufficiency of the Evidence

Because we reverse on other grounds we must determine whether there is sufficient evidence upon which Allen can be retried. *Lockhart v. Nelson*, 488 U.S. 33, 40, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) ("... a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause.") Allen maintains that his convictions may not stand because the witnesses for the State were not credible, no murder weapon has ever been recovered, and the remainder of the evidence presented to the jury was merely speculative and did not establish his guilt beyond a reasonable doubt.

In resolving this issue, we initially observe that this court will affirm a defendant's conviction if, considering only the probative evidence and reasonable inferences supporting the trial court's judgment, and without weighing evidence or assessing witness credibility, a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Rogers v. State*, 741 N.E.2d 395, 396 (Ind. Ct.App.2000), *trans. denied.* When a conviction is based on circumstantial evidence, this court will not disturb the verdict if the fact finder could reasonably infer from the

evidence presented that the defendant is guilty beyond a reasonable doubt. *Jones v. State,* 783 N.E.2d 1132, 1139 (Ind.2003); *Hawkins v. State,* 794 N.E.2d 1158, 1164 (Ind.Ct.App.2003). Additionally, the circumstantial evidence need not overcome every reasonable hypothesis of innocence; the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Hawkins,* 794 N.E.2d at 1164. Inconsistencies in the evidence are for the jury to evaluate, and to determine what evidence to believe. *Miller v. State,* 770 N.E.2d 763, 774–75 (Ind.2002).

In this case, we note that Allen does not dispute that the State proved the elements of the crimes charged beyond a reasonable doubt. Rather, he argues that he was not the perpetrator of the offenses, and the evidence offered by the State failed to prove the same.

■ The State presented evidence that Allen was seen near South Bend shortly after the murders. Tr. p. 329–40, 342–48, 357–62. Allen had been angry and upset when he resigned from Osco for embezzling money. Tr. p. 517–18, 522–23, 536–37. Partial palm prints and fingerprints belonging to Allen were found on the store's rear service door, and there was testimony that Allen—at one time—had a key to the safe. Tr. p. 246–49, 252–53, 273–80, 487–88, 499–502, 507–08, 659–64, 672–77, 680–81, 694–97, 706–09. It was also revealed that Allen had owned a handgun similar to the one used in the murders, and there was evidence that the note found near Dick's body may have been written by Allen. Tr. p. 159, 167–72, 184–85, 488–91, 543–52, 577–82, 926–27. In light of all the evidence that was before the jury, Allen's alibi evidence did not unequivocally demonstrate that he could not have committed the crime. Thus, in considering such evidence, and applying our standard of review, we cannot conclude that no reasonable jury could have found guilt beyond a reasonable doubt. We therefore reject Allen's contention that the evidence was insufficient to convict.

## CONCLUSION

In light of our discussion of the issues set forth above, we conclude that the trial court committed reversible error in excluding Bethel's testimony that was exculpatory and vital to Allen's defense. We also find that it was error to exclude the reconstructive evidence and testimony from Lumpkin.

On the other hand, we hold that the trial court properly admitted the pretrial identification evidence with respect to the photo array, and there was no error in the exclusion of McGill's testimony. We also conclude that Allen was not denied due process of law as a result of the State's preindictment delay in bringing the charges against him, and we find that the evidence was sufficient to support Allen's convictions. Given such a conclusion with regard to Allen's sufficiency claim, the State is not barred from retrying Allen. *See Joyner,* 678 N.E.2d at 390.

The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

FRIEDLANDER, J., and BAILEY, J., concur.