**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Sep 17 2013, 5:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GILDA W. CAVINESS**
Caviness Law Office, LLC
Rushville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KENNETH F. KIPP, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  73A01-1211-CR-507 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE SHELBY SUPERIOR COURT
The Honorable Jack A. Tandy, Judge
Cause No. 73D01-0807-FA-10

**September 17, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

After a night of victimizing three families in their own homes, appellant-defendant Kenneth F. Kipp was convicted of Burglary,[1] a class A felony; Armed Robbery,[2] a class B felony; two counts of Burglary,[3] a class B felony; Attempted Carjacking,[4] a class B felony; two counts of Battery with a Deadly Weapon,[5] a class C felony; Attempted Robbery,[6] a class C felony; two counts of Theft,[7] a class D felony; Resisting Law Enforcement,[8] a class D felony; and for being a Habitual Offender.[9]  Kipp now appeals raising numerous arguments, including that the trial court erred by denying his two motions for a mistrial, the photographic line-up was unnecessarily suggestive, the charging information for three counts was deficient, the evidence was insufficient to support three of his convictions, and his convictions on Counts I through V, which involved the burglary, armed robbery, and battery of a family on their own property, violated Indiana's Double Jeopardy Clause.  Finding no error and sufficient evidence, we affirm.

---

[1] Ind. Code § 35-43-2-1.

[2] Ind. Code § 35-42-5-1.

[3] I.C. § 35-43-2-1.

[4] I.C. § 35-42-5-2; Ind. Code § 35-41-5-1.

[5] I.C. § 35-42-2-1.

[6] I.C. § 35-42-5-1; I.C. § 35-41-5-1.

[7] I.C. § 35-43-4-2.

[8] I.C. § 35-44-3-3.

[9] Ind. Code § 35-50-2-8.

FACTS

On July 7, 2008, Anthony and Saundra Saba were at home with their daughter in Fountaintown when they heard a loud noise. They searched around their house for the source of the noise, but after finding nothing, they looked out the window to discover that their barn doors were open and the light located on the side of the barn was on. This was unusual because the Sabas kept their barn door closed and did not use the side light.

Anthony went outside to close the barn door, taking a golf club with him. Once outside, Anthony was approached by a man who the Sabas would later identify as Kipp. Kipp was carrying what Anthony believed was a gun but was later identified as an air drill. Kipp told Anthony to put down the golf club, or he would shoot him. Anthony explained, "[y]ou don't need to do this" and tried to get his wife to go back inside. Tr. p. 226. Anthony kept his golf club raised while backing up towards the open garage, and when he turned around to check on Saundra, Kipp struck him with the air drill. Anthony fell to the ground, and Kipp kept striking and kicking him, until everything "was kind of a blur." Id. at 227. When Saundra saw Kipp beating Anthony, she grabbed a broom and struck Kipp with it; however, Kipp got the broom away from Saundra and hit her with it, knocking her against the garage.

The Sabas continued to battle Kipp near the entrance of the garage for a few minutes, and told their daughter to go inside and call 911. The struggle at the entrance of the garage continued and every time the Sabas tried to close the automatic garage door, the struggle between the two men triggered the sensor system on the door causing it raise.

During the struggle, Kipp injured Anthony and Saundra, resulting in bruising to Saundra's arm and injuries to Anthony's face, a blood clot, and chest pains. Anthony and Saundra saw Kipp's face during the struggle and would later identify him both in and out of court. When the Sabas were able to return to the safety of their house, Saundra called 911, and Kipp left on a motorcycle.

Indiana State Police Corporal Dennis Scudder responded to the dispatch. The Sabas described Kipp's route, and Corporal Scudder found Kipp on the motorcycle in the area. The motorcycle matched the description provided to Corporal Scudder, who then followed Kipp and attempted to initiate a stop. Kipp, however, refused to cooperate and continued to drive and eventually pulled into a driveway and then into a field. Corporal Scudder followed, making contact with the back of Kipp's motorcycle to end the pursuit.

Kipp abandoned his motorcycle and ran towards the road. Corporal Scudder followed on foot for about 150 to 200 feet before pulling his hamstring muscle. Corporal Scudder then called for backup, describing Kipp's location, and other police officers responded. Shortly after calling for backup, Corporal Scudder learned that Kathy Davis, another resident living on or near Michigan Road, had reported a home entry and based on the report, Corporal Scudder concluded that it was the same perpetrator.

Kathy Davis lived with her husband, Phillip, and their daughter, near the scene of the chase in Shelby County. Kathy's daughter told her that the kitchen door had opened on its own so Kathy retrieved her shotgun, loaded it, and went into the kitchen. Inside the kitchen, she found Kipp and noticed his tattoos. Kathy immediately demanded, "Hey you

4

ol' mother f**ker, what do you want?" Tr. p. 389. Kipp immediately ran from the Davis house.

Not one to easily back down, Kathy decided to follow Kipp to her neighbor's house, thinking that he had fled in that direction. When Kathy went to her truck, she noticed that a number of items were out of place inside. Kathy proceeded to her neighbor, Max Stillabower's house, where police officers were recovering evidence left from their earlier pursuit of Kipp. Davis announced to the police that she had "just chased some tall drink of water out of [her] house." Tr. p. 391. She described Kipp as wearing no shirt, which was consistent with what other witnesses had reported about Kipp that night.

Davis returned home and another officer believed he spotted Kipp at the home of Mohammad and Cynthia Khaliq. Mohammad and Cindy were home on the night of July 7, 2008, with their son in Fountaintown. Cindy called to her husband to come to the kitchen when a strange man walked into the house. The man had a shirt wrapped around his hand, holding what appeared to be a gun but was later determined to be a sprinkler head.

Cindy's mother, who was just a few doors down, knocked on the door and came into the home during the intrusion. The man asked for the car keys and cash, so Mohammad, who was trained in law enforcement, walked him outside toward Mohammad's vehicle, but the man became upset upon seeing police cars drive by. While Mohammad and the man were outside, Cindy's mother locked the door, but the man

5

kicked it in and went back inside. Shortly thereafter, Cindy along with her son and her mother, left the house through the back. Mohammad also left the house and retrieved his gun from his vehicle but was told to put it down before he made it back to the house.

During the investigation, police officers recovered from the Khaliq's yard the tire tool that was missing from Kathy's truck. Police officers also found evidence on Stillabowers's property that had been left during the earlier pursuit of Kipp, namely, his bandana and other property belonging to the Sabas such as their key fob.

Police officers and the Indiana State Police Lab would eventually match Kipp's fingerprints and DNA with samples taken from the evidence discovered at the crime scenes, including samples taken from the bandana, the broom, and the vehicles owned by the victims. Detective Roger Clark developed two leads, one of which turned out to be a dead end when a caller identified a person named Niles Duncan. When Cindy Khaliq and Saundra Saba viewed a photo array that included Niles Duncan but did not include Kipp, Saundra identified Tyler Slage, who had nothing to do with the crimes. Cindy did not identify anyone.

Detective Clark was dispatched to investigate on July 7, 2008, and when the suspect was not apprehended that night, his investigation continued. Detective Clark first learned of Kipp from Debra Collins, who had hired Kipp to do some work on her home. Collins recognized Kipp's motorcycle. Kipp worked for Collins from July 2, 2008, through July 8, 2008, and she would pick him up at a gas station each day. However, Kipp told Collins that he would ride his motorcycle to work on July 8, 2008. On that

6

day, Kipp appeared on the job without his motorcycle, explaining that he had been pulled over in Indianapolis after having a few beers the night before. After Collins saw the news reports about the burglaries in the neighborhood, she became suspicious and fired Kipp.

An arrest warrant was issued for Kipp, and he turned himself in to law enforcement officials in Louisville, Kentucky. Detective Clark drove to Louisville and transported Kipp back to Indiana. Detective Clark, with the assistance of law enforcement in Kentucky, prepared a second photographic line-up consisting of six photographs. The photographic line-up was presented to the Sabas, Davis, and the Khaliqs. The Khaliqs selected Kipp from the line-up as did Anthony and Saundra.

Detective Clark also took a sample of Kipp's DNA which matched DNA found on the bandana, the broom, and the Kaliqis' van. In addition, Detective Clark took Kipp's fingerprints and compared them to fingerprints taken from Davis's truck; they were a match.

On October 1, 2008, the State filed its second amended information[10] charging Kipp with Count I, burglary resulting in serious bodily injury, a class A felony; Count II, armed robbery, a class B felony; Count III, theft, a class D felony; Count IV, battery with a deadly weapon, a class C felony; Count V, battery with a deadly weapon, a class C felony; Count VI, resisting law enforcement, a class D felony; Count VII, burglary, a class B felony; Count VIII theft, a class D felony; Count IX, burglary, a class B felony;

---

[10] The State filed its initial information on July 15, 2008, and its first amended information on July 31, 2008.

Count X, attempted robbery, a class C felony; and Count XI, attempted carjacking, a class B felony.[11]

Kipp's jury trial commenced on October 2, 2012, and concluded on October 4, 2012. During trial, Kipp moved twice for a mistrial. The first time occurred when Corporal Scudder testified that the motorcycle that Kipp was riding was stolen. The second time occurred when Mohammed testified that Kipp's tattoos were the type that one would get in jail. Both motions were denied.

Over Kipp's objection that the photographic line-up was unduly suggestive, the trial court admitted Detective Clark's testimony regarding the photographic line-up and witness identifications of Kipp. Pertaining to the charging information, when the trial court asked if there were any objections, Kipp stated, "No." Tr. p. 6.

The jury found Kipp guilty as charged, and Kipp admitted to being a habitual offender. On October 26, 2012, the trial court held a sentencing hearing during which it ordered that Count III merge with Count II and sentenced Kipp to an aggregate term of 110 years imprisonment. Kipp now appeals.

DISCUSSION AND DECISION

I. Motion for Mistrial

A. Standard of Review

Kipp argues that the trial court erred by denying his motions for a mistrial. As stated above, Kipp moved for a mistrial twice. The first motion was made after Corporal

---

[11] It does not appear that Kipp was alleged as being a habitual offender at this point in the proceedings.

Scudder testified that the motorcycle that Kipp was riding was stolen, and the second motion was made after Mohammed testified that Kipp's tattoos were the type that one would get in jail.

The decision to grant or deny a motion for mistrial lies within the sound discretion of the trial court. Pavey v. State, 764 N.E.2d 692, 698 (Ind. Ct. App. 2002). "The trial court's decision is afforded great deference on appeal because the trial court is in the best position to gauge the surrounding circumstances of the event and its impact on the jury." Id. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts before it. Weis v. State, 825 N.E.2d 896, 900 (Ind. Ct. App. 2005).

The granting of a mistrial is an extreme remedy that is warranted only when a less severe alternative cannot satisfactorily correct the error. Banks v. State, 761 N.E.2d 403, 405 (Ind. 2002). When appealing a motion for a mistrial, a defendant must prove that the conduct in question "was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected." Mickens v. State, 742 N.E.2d 927, 929 (Ind. 2001). The significance of the danger is determined by the probable and persuasive effect on the jury's decision. Mote v. State, 775 N.E.2d 687, 689 (Ind. Ct. App. 2002).

### B. The Motorcycle

Regarding the first instance when Kipp requested a mistrial, Corporal Scudder testified: "I realized I couldn't catch him on foot at that point and I was concerned that

he might double back, so I went back to secure my vehicle and also the stolen veh . . . or the motorcycle." Tr. p. 349.

When defense counsel approached the bench for a side bar conference and explained that Corporal Scudder had just referred to the motorcycle as stolen, which was not in evidence, the trial court responded, "I think he, he mistakenly said that. I assume there's not [sic] evidence to that [e]ffect." Id. at 350. The prosecutor explained to the trial court that the motorcycle had been stolen; however, it appears that the individual from whom that information was obtained had not testified. Accordingly, the defense counsel moved for a mistrial based on irrelevance and because the proper individual had not testified. Id. at 350-51.

In this instance, we cannot say that the trial court erred. More particularly, during the side bar conference, the trial court expressed its belief that Corporal Scudder had simply misspoke. The jury could have easily thought the same thing. Indeed, defense counsel chose not to request an admonishment or a limiting instruction, which would only draw further attention to the statement. Thus, it was more desirable to permit the jury to draw its own conclusions. Likewise, a mistrial was a remedy too extreme in these circumstances insofar as Kipp was not placed in grave peril by testimony. Accordingly, this argument fails.

## C. Jail Tattoos

Kipp requested a mistrial the second time when Mohammed testified that Kipp had "[j]ail-type" tattoos. Tr. p. 436. Kipp asserts that Mohammed's reference to his

tattoos was even more egregious in light of the fact that he had lodged an objection but Mohammed continued to respond to the question.

In this instance, although the trial court denied Kipp's motion for a mistrial, it granted his motion to strike Mohammed's statement regarding the tattoos. Additionally, Mohammed was admonished that when an objection is made while he is testifying, he is to "just stop talking and then we'll resolve the objection and go forward from there." Tr. p. 438. Thus, the trial court rectified the situation without resorting to the extreme remedy of a mistrial.

As for the probable persuasive impact on the jury, the significance of the danger in each instance was minimal at most. As will be discussed in more detail below, the jury heard testimony from multiple witnesses identifying Kipp as the perpetrator of the offenses. This renders the origins of his tattoos or whether his motorcycle was stolen rather insignificant. Therefore, this argument also fails.

## II. Photographic Line-up

Kipp contends that the photographic line-up was unnecessarily suggestive and should have been excluded. Rulings on the admissibility of evidence are reviewed for an abuse of discretion. Goens v. State, 943 N.E.2d 829, 831 (Ind. Ct. App. 2011). A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before it. Id.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the suppression of testimony regarding pre-trial identification when

11

the procedure used is unduly suggestive. J.Y. v. State, 816 N.E.2d 909, 912 (Ind. Ct. App. 2004). Without the suppression of testimony regarding pre-trial identification where overly suggestive means were used, "the defendant is subjected to the unacceptable risk that the identification process was conducted in such a way that it created a substantial likelihood of irreparable misidentification." Id.

Whether the procedure used was unnecessarily suggestive is determined under the totality of the circumstances. Id. Our Supreme Court has held that a photo array is not impermissibly suggestive if the defendant "does not stand out so strikingly in his characteristics that he virtually is alone with respect to identifying features." Farrell v. State, 622 N.E.2d 488, 494 (Ind. 1993).

The factors to consider when evaluating the likelihood of a misidentification are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; and (4) the level of certainty demonstrated by the witness. Parker v. State, 698 N.E.2d 737, 740 (Ind. 1998).

Here, the witnesses were in close proximity to Kipp. Specifically, the Sabas physically struggled with Kipp outside of their home, at or near their garage door. Tr. p. 226-235, 301-310.

Mohammed was also close to Kipp as he tried to coax him into leaving his house. Id. at 425. They spoke to each other in Mohammed's kitchen.

12

Detective Clark did not intentionally try to select photographs of individuals wearing different clothing. Tr. p. 589-98. And when Detective Clark presented the witnesses with the photo line-up, he presented it to them separately and under the instruction that they not converse about the experience with one another. Id. at 624-36. Furthermore, the six individuals in the photo array had the same basic physical characteristics while displaying some differences from each other. Id. at 594-98. However, the differences are minor when compared with the significant similarities that the individuals shared. Consequently, we cannot say that the photographic line-up was unduly suggestive, and the trial court did not err by admitting testimony regarding witness identification pertaining to it.

### III. Deficient Charging Information

Kipp asserts that the charging information for burglary as alleged in Counts I, VII, and IX is deficient. More particularly, Kipp argues that "it is not sufficient to merely allege an intent to commit a felony without specifying the particular felony intended." Appellant's Br. p. 11.

At the outset, the State maintains that Kipp has waived this argument because he failed to challenge the charging information prior to trial. Any alleged defect in the charging information should be addressed before trial to avoid waiver. Stroud v. State, 809 N.E.2d 274, 287 (Ind. 2004).

Here, Kipp did not file a motion before trial challenging the charging information. Appellant's App. p. 1-4. Furthermore, when the proceedings began, Kipp offered no

objection to the charging information even when specifically asked if he had any objections to the amended charging information. Tr. p. 5-6. Accordingly, Kipp has waived this argument.

Waiver notwithstanding, Kipp directs us to Reed v. State, 438 N.E.2d 704 (Ind. 1982). In Reed, our Supreme Court opined:

> In a charge of burglary, it is not sufficient merely to allege an intent to commit a felony without specifying the particular felony intended. However, the particularities of the intended or "ulterior" felony need not be charged. The critical aspect of a charge of burglary, in addition to the breaking and entering is the intent with which the breaking and entering were done. The information alleged the intent to commit a theft, and the evidence clearly sustained a finding that such intent was present.

Id. at 706 (emphasis added) (internal citations omitted).

Additionally, in Stwalley v. State, the defendant had waived his argument that the charging information was deficient because he had failed to raise the argument before trial. 534 N.E.2d 229, 232 (Ind. 1989), abrogated on other grounds. Nevertheless, our Supreme Court conducted a fundamental error analysis, concluding that "[w]hile the intended felony was not specified in the information, the burglary count was accompanied by the child molesting and rape charges." Id. Furthermore, "[c]ircumstantial and direct evidence showed that he broke and entered the home with the intent to commit rape. Under these circumstances the harm to Stwalley caused by the insufficient burglary information was not substantial." Id. at 233.

The implication of our Supreme Court's reasoning in Reed is that while the ulterior felony need not be separately charged, it must be at least described in the

14

burglary charging information. Alternatively, the ulterior felony if separately charged would also be sufficient. More directly, in Stwalley, because the burglary count was accompanied by the ulterior felonies, the defendant failed to show fundamental error.

In this case, because Kipp failed to object to the charging information before trial, he must show fundamental error. Stwalley, 534 N.E.2d at 232. And because the charging informations also alleged that Kipp committed the ulterior felonies, Kipp has failed to show fundamental error.

## IV. Sufficiency of the Evidence

Kipp contends that there was insufficient evidence to support his convictions in Count I, burglary resulting in bodily injury; Count II, armed robbery; and Count VII, burglary. When reviewing the sufficiency of the evidence, this court will neither reweigh the evidence nor judge the credibility of witnesses. Dillard v. State, 755 N.E.2d 1085, 1089 (Ind. 2001). It is the fact-finder who must determine whom to believe and what portions of conflicting testimony to believe. In re J.L.T., 712 N.E.2d 7, 11 (Ind. Ct. App. 1999). This Court will reverse only if no rational finder of fact could have found the defendant guilty. Hyppolite. v. State, 774 N.E.2d 584, 598 (Ind. Ct. App. 2002).

### A. Count I – Burglary Resulting in Bodily Injury

To convict Kipp under Count I, the State was required to prove that Kipp knowingly or intentionally broke and entered the Sabas' barn while armed with a deadly weapon with the intent to commit a felony therein, and that his crime resulted in bodily injury. Appellant's App. p. 68; Ind. Code § 35-43-2-1. Anthony testified that he looked

15

outside and saw that his barn door was unexpectedly open and the light was on. Tr. p. 232. Additionally, Anthony kept an old dresser to store his tool box. Anthony stated that the dresser is "always all closed up. The only time it's opened . . . like that is if I'm looking in it for a nut or bolt or something that I need for a project and then I close it back up." Id. at 241-42. However, after Kipp left the Sabas' barn on July 7, 2008, all of the drawers were open. Id. This is sufficient to show that Kipp entered the Sabas' barn with intent to commit a felony therein, namely, theft.

As for bodily injury, Anthony testified that Kipp confronted him armed with an air drill and kicked him in the face and head and he was "out." Tr. p. 226-27. A few days later, Anthony consulted a doctor to discover that he had a blood clot underneath his skin, had severe chest pains and required triple bypass heart surgery. Id. at 232. This evidence was sufficient to show bodily injury while armed with a deadly weapon under Count I. Consequently, the State presented sufficient evidence to sustain Kipp's conviction under Count I.

### B. Count II – Armed Robbery

To convict Kipp of Count II, the State was required to prove beyond a reasonable doubt that while Kipp knowingly or intentionally took the Sabas' key fob by using or threatening to use force on any person and that he did so while armed with a deadly weapon and/or it resulted in bodily injury to Saundra and/or Anthony. Appellant's App. p. 68; Ind. Code § 35-42-5-1.

16

As stated above, Anthony testified that Kipp was armed with the Sabas' air drill when they confronted him. Tr. p. 226. Furthermore, the fact-finder could reasonably infer that Kipp took the Sabas' key fob, which was later found at Stillabower's house along with Kipp's bandana. Accordingly, the State presented sufficient evidence under Count II.

### Count VII – Burglary

To convict Kipp of burglary, the State had to prove beyond a reasonable doubt that Kipp knowingly or intentionally broke and entered into a dwelling belonging to Kathy Davis with intent to commit a felony therein. Appellant's App. p. 69-70; I.C. § 35-43-2-1. In this case, Davis, armed with her shotgun, encountered Kipp in her kitchen and quickly scared him away. Tr. p. 389. Nonetheless, Davis noticed "a sunburst tattoo" and identified the man as "six foot tall." Id. at 387-88. Davis's description of Kipp matched his appearance. Appellant's App. p. 236. Moreover, the property that was missing from Davis's truck was later found at the Khaliqs' home. Tr. p. 393. Thus, a reasonable fact-finder could have concluded that Kipp entered the Davis home with intent to commit a felony therein, and Kipp's sufficiency arguments fail.

### V. Double Jeopardy

Finally, Kipp argues that double jeopardy violations occurred with respect to his convictions for the offenses at the Saba residence. Kipp essentially contends that these convictions arise from the same factual evidence.

17

Article I, Section 14 of the Indiana Constitution provides: "No person shall be put in jeopardy twice for the same offense." Under the actual evidence test, multiple convictions constitute double jeopardy if there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." Richardson v. State, 717 N.E.2d 32, 53 (Ind. 1999). Our Supreme Court has stated that "the possibility must be reasonable, not speculative or remote." Griffin v. State, 717 N.E.2d 73, 89 (Ind. 1999).

Moreover, the Indiana Double Jeopardy Clause "is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." Spivey v. State, 761 N.E.2d 831, 833 (Ind. 2002) (emphasis added). To determine which facts were used by the jury, a reviewing court will examine the charging information, evidence, arguments, and jury instructions. Davis v. State, 770 N.E.2d 319, 324 (Ind. 2002).

In his Reply Brief, Kipp asserts:

> The State's evidence for the burglary, robbery, theft, and battery boils down to these facts: Kipp broke and entered the Saba barn, took a key fob and coins from somewhere on the Saba property, and when confronted by the Sabas, struck Anthony Saba with an air drill and struck Saundra Saba with her broom.

Reply Br. p. 8.

At first blush, Kipp's argument is convincing insofar as its simplicity seems to indicate that perhaps the State elevated numerous offenses based on the same evidence.

18

However, a closer inspection of the Sabas' testimony, the charging information, and the detailed jury instructions reveal that the circumstances were not so simple.

To begin, a brief summary of the Sabas' testimony is helpful. Anthony testified that Kipp confronted him outside the barn with what appeared to be a gun, but was later determined to be Anthony's air drill, which was stored in the barn. Tr. p. 226-27, 229. Kipp struck Anthony in the face with the air drill, knocking Anthony to the ground, causing him injury. Kipp then proceeded to kick Anthony in the face and head, causing him further injury. Id. at 227.

Saundra witnessed her husband being kicked, retrieved a heavy broom, and tried to hit Kipp with the broom. Id. at 303. Saundra managed to strike Kipp several times, but was never able to knock him down. Id. Kipp took the broom away from Saundra and struck her hard with it, causing her injury. Id. at 307. The Sabas eventually made it back into their home and called 911, and Kipp drove away on his motorcycle. Id. at 308-09. The Sabas' key fob was missing but was later found on a neighbor's property along with Kipp's bandana.

Beginning with Count I, class A felony burglary, the charging information alleged that "Kipp did knowingly or intentionally break and enter . . . the barn or Anthony and/or Saundra Saba, with intent to commit a felony therein, FURTHER, said offense resulted in bodily injury to Anthony and/or Saundra Saba . . . all while armed with a deadly weapon." Appellant's App. p. 68. Likewise, the jury instruction stated that for the jury to convict

19

Kipp for a Class A felony the offense had to result in bodily injury, and Kipp had to be armed with a deadly weapon. Id. at 98.

Here, as stated above, Kipp was armed with an air drill. Although it was not a gun as the Sabas first thought, no one contends that it is not a deadly weapon. As for the bodily injury, both Anthony and Saundra testified that Kipp kicked Anthony multiple times while Anthony was down and that Anthony sustained injuries from this. There is nothing in the Indiana Code section 35-43-2-1, the charging information, or the jury instruction that states that the bodily injury must result from the deadly weapon with which the defendant is armed. See Toney v. State, 961 N.E.2d 57, 60 (Ind. Ct. App. 2012) (holding that evidence was sufficient to establish class A felony burglary resulting in bodily injury where the victim experienced physical pain as the result of the defendant's action of grabbing her hand and twisting her phone out of her hand).

Moving forward to Count II, class B felony armed robbery, the charging information stated Kipp knowingly or intentionally took the "change and/or key fob from Anthony and/or Saundra Saba . . . all while armed with a deadly weapon, and/or which resulted in bodily injury to Anthony and/or Saundra Saba." Appellant's App. p. 68. Similarly, the jury was instructed that to convict Kipp of armed robbery, he had to knowingly or intentionally take the Sabas' property by using or threatening the use of force and that for a class B felony, Kipp had to be armed with a deadly weapon or while committing the robbery, bodily injury had to result to Anthony or Saundra. Id. at 101.

In this case, the Sabas' key fob was missing after their traumatic ordeal with Kipp and was later found with his bandana on their neighbor's property. Additionally, Kipp threatened Anthony and Saundra while armed with an air drill. And the fact that Kipp was armed with the air drill to commit the burglary does not present a double jeopardy violation. Indeed, our Supreme Court has opined that a "defendant's use of the same weapon in the commission of separate and distinct offenses [] does not present a violation of the Indiana Double Jeopardy Clause." Miller v. State, 790 N.E.2d 437, 439 (Ind. 2003).

Count III alleged that "Kipp did knowingly or intentionally exert unauthorized control over the property of the [Sabas]." Appellant's App. p. 68-69. This conviction is easily resolved inasmuch as Kipp exerted unauthorized control over Anthony's air drill, which Anthony testified he kept in the barn.

Count IV and Count V can be resolved simultaneously. Count IV alleged that Kipp "knowingly or intentionally touch[ed] Saundra Saba in rude, angry or insolent matter, by means of a deadly weapon, to-wit: a broom, resulting in bodily injury." Appellant's App. p. 69. Count V alleged that "Kipp did knowingly or intentionally touch Anthony Saba in a rude, angry or insolent manner, by means of a deadly weapon, resulting in bodily injury." Id.

In the instant case, Saundra testified that Kipp struck her hard with a broom knocking her into the garage, causing bruising to her arm. And Anthony testified that Kipp struck him in the head with the air drill, knocking him to the ground. Thus, Counts

IV and V were supported by evidence not used in any of the previous convictions, and there is no double jeopardy violation, and this argument fails.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and VAIDIK, J., concur.